[No. 64100-5. En Banc.]
Argued December 8, 1998. Decided October 21, 1999.
*In the Matter of the Detention of* RICHARD GARRETT TURAY, *Appellant.*

---

[8]For general discussion see *In re Personal Restraint of Well*, 133 Wn.2d 433, 451-52, 946 P.2d 750 (1997) (Sanders, J., dissenting).

382

*Sheryl G. McCloud,* for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Donald J. Porter, Michele Ann Hauptman,* and *David J.W. Hackett, Deputies*; and *Christine O. Gregoire, Attorney General,* and *Sarah Jane Coats, Assistant,* for respondent.

ALEXANDER, J. — After a King County Superior Court jury found Richard Turay to be a sexually violent predator (SVP), the trial judge committed him to the Special Commitment Center (SCC) at Monroe. Turay appealed and sought direct review by this court of his commitment and the trial court's rulings on numerous of his pretrial, trial, and posttrial motions. We granted review. Turay also filed a personal restraint petition (PRP) in this court in which he raised basically the same issues that he raised on appeal, including the question of whether the conditions of his confinement and the statute under which he was committed are unconstitutional. We granted review of Turay's PRP as well as the State's cross-appeal of the trial court's ruling that the State bears the burden of proof at show cause hearings in SVP commitment trials. We hold that the commitment statute is constitutional and, therefore, affirm the order of commitment.

## FACTS

In 1991, a less than unanimous King County Superior Court jury determined that Richard Turay was an SVP within the parameters of RCW 71.09.060, and he was, therefore, committed to the SCC at Monroe. Following Turay's commitment, this court issued its decision in *In re Personal Restraint of Young*, 122 Wn.2d 1, 857 P.2d 989 (1993), in which we held that a unanimous jury verdict is

necessary to support a finding that an individual is an SVP. In light of that opinion, the Court of Appeals vacated the order committing Turay, and remanded to the superior court for a new trial.

In November 1993, Turay filed a motion, in superior court, to dismiss the State's petition and for his immediate release based upon, inter alia, "the due process and equal protection clauses of the state and federal constitutions." Clerk's Papers (CP) at 330. This motion was denied. In January 1994, Turay filed an additional motion to dismiss the commitment proceeding, arguing that the court "must dismiss the [commitment] petition against [him] because the conditions of his confinement are punitive, not treatment oriented in nature." CP at 357. In September 1994, Turay filed still another motion to dismiss based on a "violation of [his] privacy right." CP at 675. The latter two motions were not ruled on before trial.

On several occasions prior to his second commitment trial, Turay engaged in colloquy with the trial court about the possibility of representing himself. On one occasion, he filed a written motion in which he requested that attorney Mark Mestel represent him at his upcoming commitment trial or that, alternatively, his then-attorney, Jennifer Shaw, continue to represent him. As a third alternative, Turay requested that the trial court allow him to act as his own counsel. The trial court ordered that Shaw continue to represent Turay.

Also prior to his new trial, Turay filed a lawsuit in the United States District Court for the Western District of Washington against several officials at the SCC.[1] In this suit, which he maintained under 42 U.S.C. § 1983, Turay alleged, as he had in state court, that the conditions of his confinement at the SCC were unconstitutional and thus violative of his civil rights as guaranteed by the United States Constitution. A federal court jury found that the officials at the SCC had violated Turay's constitutional right to access to adequate mental health treatment and awarded

---

[1]*Turay v. Weston*, No. C91-664WD (W.D. Wash. 1994)

him $100.00 in compensatory damages. Following receipt of the verdict, the United States District Court placed the SCC under an injunction "narrowly tailored to remedy this constitutional violation."[2] CP at 477.

At Turay's second commitment trial, which took place in superior court following entry of the injunction in the federal litigation, a jury found that he was an SVP and that "the best interests of [Turay] or others will not be served by less restrictive treatment which is an alternative to total confinement." CP at 844. Accordingly, on October 19, 1994, the trial court entered an order committing Turay as an SVP. Nine days later, Turay filed a motion that he denominated as a "Motion for New Trial and for Extension of Time." CP at 847.

In April 1995, in response to Turay's September 1994 pretrial motion to dismiss, the trial court entered "Findings of Fact and Conclusions of Law and [an] Order" in which it concluded that certain aspects of the SCC's treatment program violated Turay's substantive due process rights. CP at 848-63. It, therefore, ordered the SCC to remedy those deficiencies in its treatment program and "to report to the Court within 30 days . . . as to the status of the conditions found to be in violation of [Turay's] constitutional rights." CP at 863. On December 8, 1995, a show cause hearing was held, pursuant to RCW 71.09.090(2), to determine "whether facts exist that warrant a hearing on whether Richard Turay's condition has so changed that he is safe to be conditionally released to a less restrictive alternative or unconditionally discharged." CP at 5. The trial court determined at that hearing that sufficient facts were not presented to warrant a further hearing, and it ordered that Turay continue in detention.

---

[2]On November 25, 1998, the federal court entered an order continuing the injunction because it found that the conditions of confinement remained, in part, unconstitutional. The federal court noted, however, that the "defendants were making good faith efforts to achieve compliance . . . [and that a] tremendous amount of work has been invested by the parties, counsel, special master, and the court to accomplish an inherently difficult task." Third Statement of Supplemental Authorities, app. A at 4.

One week later, Turay filed a motion for an order to dismiss and to vacate his detention, arguing that his confinement at the SCC amounted to "punishment," and thus "violate[d] the double jeopardy clause." CP at 948. He also filed a "Motion for Reconsideration of RCW 71.09.090 Continuing Detention Decision," alleging that "RCW 71.09's yearly review provisions" violated the Equal Protection and Due Process clauses of the Washington State and United States Constitutions. CP at 1050, 1052, 1068.

On May 9, 1996, the trial court entered an order in response to Turay's motions to dismiss and for reconsideration. It upheld the constitutionality of RCW 71.09.090 and denied Turay's request for immediate release. It did, however, conclude that RCW 71.09.090 violated equal protection by failing to grant an SVP a mandatory review hearing at intervals of 180 days as is the case with mentally ill persons under RCW 71.05.[3] The remedy imposed by the trial court was simply to require review hearings for SVPs every 180 days as opposed to annually as provided by RCW 71.09.090. In addition, the court concluded that the State bears the burden of proof at show cause hearings held pursuant to RCW 71.09.090(2), at which the court determines whether there is probable cause to believe that the SVP's "mental abnormality or personality disorder has so changed that [he or she] is not likely to engage in predatory acts of sexual violence if conditionally released." CP at 1156-57.

On May 22, 1996, Turay appealed and sought direct review by this court of the trial court's order committing him as an SVP, and its rulings on "all pretrial, trial, and post-trial motions." CP at 1164. The State cross-appealed the trial court's ruling placing the burden of proof on it at show cause hearings held pursuant to RCW 71.09.090(2). Shortly thereafter, Turay filed a PRP in this court in which he raised basically the same issues that he raised on direct

---

[3]RCW 71.05 governs the involuntary civil commitment of individuals who suffer from a serious mental disorder, and as a result of that disorder, pose a significant danger to themselves or others.

appeal. We granted review of the direct appeal and the PRP, and consolidated the two cases.

Because the State raised a question as to the timeliness of Turay's direct appeal, he filed a motion to enlarge time to file notice of appeal. The State subsequently filed a motion to redesignate the portion of Turay's notice of appeal relating to the trial court's May 9, 1996 order into a "notice for discretionary review." Mot. to Redesignate at 2. These motions were passed to the merits.

We also requested that the parties advise us in writing of any new developments regarding the conditions at the SCC. After both parties filed their responses to this request, the State filed a motion to strike a portion of Turay's response, claiming that Turay attempted to improperly supplement the appellate record in violation of RAP 9.1 and 9.11. This motion was also passed to the merits.

## I. PROCEDURAL ISSUES
### A. Timely Notice of Appeal

The State claims that Turay's appeal of his 1994 commitment order was not timely and should, therefore, be dismissed. Pursuant to RAP 5.2(a), Turay had 30 days from the date the commitment order was entered within which to file his notice of appeal. Although Turay did not file his "notice of appeal" until May 22, 1996, which was far more than 30 days after the date the commitment order was entered, he did file his motion for new trial and for extension of time within 10 days of the entry of the commitment order.[4] Turay contends that because the trial court failed to rule on this motion, the time for filing his appeal was tolled pursuant to RAP 5.2(e) until the trial court issued its May 9, 1996 order denying his release from confinement, an or-

---

[4]CR 59(b) provides that a motion for a new trial must be filed within 10 days after entry of the judgment. Accordingly, Turay filed this motion in a timely manner.

der which he concedes "decided [his] outstanding motion for [a] new trial."[5] Appellant's Opening Br. at 69.

The State counters Turay's argument by asserting that the motion, which Turay filed on October 28, 1994, was not, notwithstanding its title, a motion for a new trial and, thus, did not toll the period within which to file a notice of appeal. Turay's motion, in relevant part, stated:

[R]espondent . . . moves the court for an order for a new trial. Respondent additionally seeks an order granting a thirty day extension of time in which to identify the specific reasons in law and fact as to the grounds for his motion. This motion is based on CR 59, the files and records herein, and the attached affidavit of Karen P. O'Shea.

CP at 847. This motion was supported by an affidavit by Turay's attorney, in which she stated:

1. I am one of the attorneys for respondent Richard Turay.

2. My law firm substituted as counsel for respondent on October 19, 1994.

3. I have met with Mr. Turay's previous counsel and have been provided with their file materials.

4. The file in this case is voluminous and the issues are complex. I will be unable to review and digest all of the relevant materials within ten days after the entry of the Order of Commitment.

5. In order to adequately represent the interests of respondent, an additional thirty days from the date of this motion is requested in which to state the grounds for a new trial.

CP at 3.

Even viewing the motion and its supporting affidavit in a light favorable to Turay, it cannot be said that he meticulously complied with the procedural requirements for a motion for a new trial that are found in CR 59(b) and King

---

[5]RAP 5.2(e), in relevant part, provides that a "notice of appeal of orders deciding certain timely motions designated in this section must be filed in the trial court within . . . 30 days after the entry of the order."

County Local Rule (LR) 7.[6] Indeed, Turay's counsel concedes that his motion was "slim." Appellant's Opening Br. at 69. He contends, however, that it was legally sufficient because "nothing in the rules differentiates between well prepared and poorly prepared motions." Appellant's Opening Br. at 69.

 When this court made major revisions to the rules of civil procedure in 1967, it had as a goal the elimination of "many procedural traps now existing in Washington practice' " and minimization of "technical miscarriages of justice inherent in archaic procedural concepts once characterized by Vanderbilt as 'the sporting theory of justice.' " *Curtis Lumber Co. v. Sortor*, 83 Wn.2d 764, 766, 767, 522 P.2d 822 (1974) (quoting in part FOREWORD to CIVIL RULES FOR SUPERIOR COURT, 71 Wn.2d xxiii, xxiv (1967)). In keeping with this mandate, Washington's appellate courts have strived to elevate substance over form, and decide cases on their merits. *See Vaughn v. Chung*, 119 Wn.2d 273, 280, 830 P.2d 668 (1992) (holding "that the civil rules contain a preference for deciding cases on their merits rather than on procedural technicalities"); *Weeks v. Chief of State Patrol*, 96 Wn.2d 893, 895, 639 P.2d 732 (1982) (stating the "present rules were designed to allow some flexibility in order to avoid harsh results"); *First Fed. Sav. & Loan Ass'n v. Ekanger*, 93 Wn.2d 777, 781, 613 P.2d 129 (1980) (holding that "whenever possible, the rules of civil procedure should be applied in such a way that substance will prevail over form"). Furthermore, in *In re Saltis*, 94 Wn.2d 889, 896, 621 P.2d 716 (1980), we held that substantial compliance with procedural rules is sufficient because " 'delay and even the loss of lawsuits [should not be] oc-

---

[6]CR 59(b), in relevant part, provides that "[a] motion for a new trial or for reconsideration shall identify the specific reasons in fact and law as to each ground on which the motion is based." King County LR 7(b)(4)(B) elaborates on this requirement and mandates that a motion for a new trial must state the relief requested, the issues, the evidence relied upon, and any legal authority relied upon. In addition, Turay failed to attach a proposed order when he filed the motion for a new trial, despite the fact that LR 7(b)(4)(C) mandates that "[t]he moving party and any party opposing the motion shall attach to their papers a proposed order."

casioned by unnecessarily complex and vagrant procedural technicalities.' '' (alteration in original) (quoting *Curtis Lumber*, 83 Wn.2d at 767).

After viewing Turay's October 28, 1994 motion and supporting affidavit with the aforementioned principles in mind, we are satisfied that the submissions satisfy the spirit, if not the letter, of the requirements set forth in CR 59 and King County LR 7. Significantly, the motion sets forth the relief that Turay requests. Although it is a bit of a stretch to say that the motion and affidavit set forth "the specific reasons in fact and law as to each ground on which the motion [was] based," we believe we can be generous in reviewing Turay's submissions because, as a practical matter, he has raised the same issues in his PRP.[7] CR 59(b).

As an alternative argument, the State asserts that Turay's notice of appeal of May 22, 1996 was not timely because the trial court decided "any remaining pretrial motions" in the April 4, 1995 order, wherein it entered findings of fact and conclusions of law and an order in regard to Turay's September 1994 motion to dismiss. Br. of Resp't and Cross-Appellant at 18-19. This argument fails because the April 1995 order did not purport to decide Turay's motion for a new trial. Rather, it dealt strictly with his pretrial motion to dismiss.

Additionally, the State claims that, regardless of the procedural sufficiency of Turay's motion for a new trial, it did not toll the appeals period because Turay failed to "note" the motion for hearing. Br. of Resp't and Cross-Appellant at 13, 14. This contention also lacks merit because the "failure to note the motion at the time it is served and filed does not affect the extension of time for appeal under RAP 5.2(e)." *Buckner, Inc. v. Berkey Irrigation Supply*, 89 Wn. App. 906, 916, 951 P.2d 338, *review denied*, 136 Wn.2d 1020, 969 P.2d 1063 (1998).

In short, we are satisfied that Turay's October 28, 1994

---

[7] In addition, this allows us to reach the issue the State raises in its cross-appeal.

motion may be treated as a valid motion for a new trial. It, therefore, tolled the time for filing an appeal until May 9, 1996, the date when the motion was effectively denied. Consequently, Turay's May 22, 1996 notice of appeal was timely filed.

### B. State's Motion to Redesignate a Portion of Turay's Appeal as a Notice for Discretionary Review

As noted above, the State moved this court for an order "redesignating [the] portion of . . . Turay's notice of appeal seeking review of the [May 9, 1996] post-commitment order to a notice for discretionary review." Mot. to Redesignate at 1. It also contends that this request for "[d]iscretionary review should . . . be denied under RAP 2.3(b)." Br. of Resp't and Cross-Appellant at 23.

RAP 2.2(a) sets forth the grounds on which a party may appeal a decision of the superior court as a matter of right. The State contends that postcommitment orders in SVP cases do not fall under any of the grounds covered by RAP 2.2(a) and, thus, "review can only be sought through a timely notice of discretionary review." Mot. to Redesignate at 4.

█ The only subsection of RAP 2.2(a) arguably applicable to the postcommitment order at issue is RAP 2.2(a)(1), which provides that a party may appeal from a "*final judgment* entered in any action or proceeding." (Emphasis added.) However, a "final judgment" is one that settles all the issues in a case. *See Rhodes v. D&D Enters., Inc.*, 16 Wn. App. 175, 178, 554 P.2d 390 (1976); *see also* CR 54(a)(1) (providing that a "judgment is the final determination of the rights of the parties in the action"). Pursuant to RCW 71.09.090(3), the superior court has continuing jurisdiction over a civilly committed individual until he or she is unconditionally discharged. In our judgment, the postcommitment order was not a "final judgment" because it did not constitute a final determination of Turay's rights, nor did it settle all of the issues in the case. *Cf. In re Deten-*

*tion of Petersen*, 138 Wn.2d 70, 88, 980 P.2d 1204 (1999) ("A decision under RCW 71.09.090(2) finding no probable cause is not a final order after judgment in light of the court's continuing jurisdiction over the committed persons until their unconditional release."). Because the May 9, 1996 order was not a "final judgment," we grant the State's motion to designate the portion of Turay's appeal seeking review of that order as a "notice for discretionary review."[8]

Turay, possibly in recognition of the meritorious nature of the State's motion,[9] requests that if we redesignate his notice of appeal, that we consider the brief he submitted in support of his notice of appeal "as the required substantive motion for discretionary review." Opp'n to State's Mot. to Redesignate at 15. Even considering that brief, we conclude that Turay fails to satisfy the criteria found at RAP 2.3(b) for discretionary review, and, therefore, we reject his motion for discretionary review of the postcommitment order.[10] In doing so, we note that the State's victory on this issue is somewhat Pyrrhic, because Turay has raised the same issues in his appeal from the October 1994 order of

---

[8]The dissent asserts that our holding "diminishes [Turay's] access to whatever justice may be provided through appellate review." Dissenting op. at 425. The dissent goes on to contend that Turay may appeal the trial court's May 9, 1996 Order Denying Motions for Reconsideration and to Dismiss as of right pursuant to RAP 2.2(a)(10), which states that orders granting or denying a motion to vacate a judgment may be appealed as of right. Dissenting op. at 425. This contention ignores the fact that a person found to be an SVP is not denied access to appellate review because all SVPs may, as of right, appeal their *initial order of commitment* pursuant to RAP 2.2(a)(8). Furthermore, the record does not support the dissent's characterization of the trial court's May 9, 1996 order. That order responded to, among other things, Turay's December 15, 1995 "Motion to Dismiss and Vacate Detention" based upon *the conditions of confinement* at the SCC. This motion was not, as the dissent asserts, a motion to vacate the judgment declaring Turay an SVP. Moreover, as we have noted above, Turay did not need to file such a motion because he was entitled to, and indeed did, appeal as a matter of right the initial decision ordering his commitment as an SVP pursuant to RAP 2.2(a)(8). Finally, our conclusion is buttressed by the fact that Turay has *never* asserted that he may appeal the trial court's May 9, 1996 postcommitment order pursuant to RAP 2.2(a)(10).

[9]Turay conceded that the State may be correct. *See* Opp'n to State's Mot. to Redesignate at 1 (stating that "the state may be correct in arguing that the proper method of seeking review of the trial court's recommitment decision is not by direct appeal").

[10]RAP 2.3(b) provides that "discretionary review will be accepted only:

commitment, that he raised in what we have now denominated as a request for discretionary review of the May 9, 1996 postcommitment order.

## C. State's Motion to Dismiss Turay's Personal Restraint Petition

As noted above, Turay filed a PRP in 1997 in which he incorporated the same arguments that he set forth in his opening brief in support of his direct appeal. Turay also raised a new claim in his PRP to the effect that the trial court erred in admitting evidence of his 1977 rape conviction at his commitment trial because the conviction was unconstitutionally obtained. The State asserts that the "portions of the PRP duplicating the direct appeal should be dismissed under RAP 16.4(d) because Turay currently has an adequate remedy in his direct appeal." State's Mot. on the Merits to Dismiss Turay's PRP at 1. The State also contends that "[t]he remainder of the PRP, which challenges the 1977 rape conviction[,] is barred by RCW 10.73.090." State's Mot. on the Merits to Dismiss Turay's PRP at 1.

RAP 16.4(d) states, in relevant part, that "[t]he appellate court will only grant relief by a personal restraint petition if other remedies which may be available to petitioner are inadequate." Because we have determined that Turay filed his direct appeal in a timely fashion, he has an adequate remedy for all of the claims that he sets forth in the PRP, except for his claim that admission of his 1977 rape conviction was error. Thus, we need address only the portion of the PRP dealing with that issue.

■ With regard to his 1977 rape conviction, Turay as-

---

"(1) If the superior court has committed an obvious error which would render further proceedings useless;

"(2) If the superior court has committed probable error and the decision of the superior court substantially alters the status quo or substantially limits the freedom of a party to act; or

"(3) If the superior court has so far departed from the accepted and usual course of judicial proceedings, or so far sanctioned such a departure by an inferior court or administrative agency, as to call for review by the appellate court."

serts that because SVP commitment proceedings are civil in nature, RCW 10.73.090 is inapplicable. This assertion, however, ignores the plain language of RCW 10.73.090(1), which provides that "[n]o petition or motion for collateral attack on a judgment and sentence in a criminal case may be filed *more than one year after the judgment* becomes final if the judgment and sentence is valid on its face and was rendered by a court of competent jurisdiction." (Emphasis added.) Because Turay is collaterally attacking his 1977 rape conviction on constitutional grounds, the statute applies. Accordingly, his failure to file a PRP within a year of this conviction bars our consideration of it. To hold otherwise would lead to the absurd result of condoning Turay's failure to challenge the conviction for over 20 years.

Turay argues that, "[e]ven if the one year statute of limitations applies to civil commitment actions like this one," the one-year period should begin from when the conviction is used against him in a subsequent proceeding. Reply Br. in Supp. of PRP at 10. The argument fails, this court having held that the one-year period in which to challenge a conviction by collateral attack runs from when the conviction becomes final, and not when the conviction is used in subsequent proceedings. *See In re Personal Restraint of Runyan*, 121 Wn.2d 432, 450-51, 853 P.2d 424 (1993).[11]

## II. SUBSTANTIVE ISSUES RAISED BY TURAY
### A. Trial Court's Refusal to Allow Turay to Represent Himself

Turay claims that he "made a clear, timely, and unequivocal request to represent himself" before his second commitment trial, and that the trial court committed reversible error when it denied this request. Appellant's Opening

---

[11]Because we have dismissed Turay's entire PRP, the State's motion to strike portions of the letter that Turay submitted to this court as a supplement to the PRP is moot.

Br. at 15. The State responds that Turay's request for self-representation was at most "equivocal," and was, therefore, properly denied. Br. of Resp't and Cross-Appellant at 27.

 If Turay desired to represent himself, his request to do so must have been unequivocal in the context of the record as a whole.[12] *State v. Stenson*, 132 Wn.2d 668, 740-42, 940 P.2d 1239 (1997), *cert. denied*, 523 U.S. 1008 (1998). In addition, the United States Supreme Court requires "that courts indulge in every reasonable presumption" against a defendant's waiver of his or her right to counsel. *Brewer v. Williams*, 430 U.S. 387, 404, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977); *see also State v. Robtoy*, 98 Wn.2d 30, 40, 653 P.2d 284 (1982). Accordingly, in determining whether Turay's requests to represent himself were unequivocal, we must view the record as a whole, keeping in mind the presumption against the effective waiver of right to counsel.

At a pretrial hearing held on November 16, 1997, Turay indicated to the trial court that he was making a motion "to represent myself with standby counsel." Report of Proceedings (RP) (Nov. 16, 1993) at 13. He prefaced this comment, however, with several requests to have Mark Mestel, an attorney who had represented him at his first commitment trial, represent him again. Because Mestel was unavailable at that time, the trial judge asked Turay if he would be willing to work with Jennifer Shaw, of the Public Defenders Association, until the court could determine whether Mestel would be able to represent him at some time in the future. Turay did not directly respond to the trial court's inquiries at that point. Later in the hearing, the trial court and Turay engaged in the following colloquy:

> THE COURT: Are you willing to work with Ms. Shaw to have her raise whatever motions she thinks are proper in your behalf? . . . .

---

[12]Further, even "when the right is unequivocally asserted . . . it may still be subsequently waived by words or conduct." *State v. Fritz*, 21 Wn. App. 354, 360, 585 P.2d 173, 98 A.L.R.3D 1 (1978), *review denied*, 92 Wn.2d 1002 (1979).

. . . .

 TURAY: . . . *I don't know.* I'd have to think it over. I can't make that decision right now.

RP (Nov. 16, 1993) at 10-11 (emphasis added). The discussion between Turay and the court continued:

 TURAY: Again, do you want me to work with her [Shaw] on the motions that I just presented, or do you want me to work with her under this—this law that was found constitutional?

 THE COURT: I want you to work with her at least until we find out a definite word from Mr. Mestel on every aspect of this case . . . .

 TURAY: *All right.*

RP (Nov. 16, 1993) at 12 (emphasis added). Finally, the discussion ended with the following exchange:

 THE COURT: [A]ll I'm asking right now is, are you willing to work with Ms. Shaw? I don't care if you call her standby counsel or anything, are you willing to work with her so that she can make the other motions she believes may have merit to this Court as we start this process?

 . . . .

 TURAY: On the motions I just presented—

 THE COURT: Yes.

 TURAY: . . . Instead of me just coming off the top of my head with an answer, can I have the Court's permission to think this over?

 THE COURT: Absolutely.

RP (Nov. 16, 1993) at 13-14. These exchanges illustrate that at this point Turay did not state an unequivocal desire to proceed without assistance of counsel. To the contrary, it is apparent that he wanted an attorney, Mark Mestel, to represent him. At best he was ambivalent about whether he would accept the appointment of substitute counsel.

 At a subsequent hearing that was held on December 15,

1993 the trial court again broached the subject of whether Turay desired to represent himself. In response to this inquiry, Turay's court-appointed attorney, Ms. Shaw, expressly stated, "Mr. Turay and I have discussed this and *Mr. Turay does wish to have me representing him* on the pretrial motions filed and argue them today." RP (Dec. 15, 1993) at 3 (emphasis added). The following day the issue of whether Turay desired to represent himself again surfaced. At this time, Turay renewed his request to have the court appoint Mestel as his counsel. Turay went on to state that if Mestel could not represent him, he would like the court to appoint another attorney, Jim Short, as his counsel.

The trial court denied, without prejudice, Turay's request to have Mestel represent him. It did so because Mestel was unavailable. At that point, Turay made another reference to acting as his own counsel, and was asked by the trial court if he was in fact making a motion to represent himself. Turay responded, "I would like to reserve the motion I just made in representing myself for a later date." RP (Dec. 16, 1993) at 87. These statements by Turay, in our view, do not satisfy the "unequivocal" standard.

In February 1994, the trial court entered an order in response to another motion by Turay. In his motion, Turay requested that the court (1) appoint Mestel to represent him; (2) alternatively, order Shaw to remain as his counsel; and (3) as a last choice, allow him to act as his own counsel. The trial court granted Turay's second request, and ordered that Shaw continue to represent him. Significantly, in *Stenson* this court stated that if a defendant requests to act as his own attorney as an alternative to substitution of a new counsel, this may constitute an indication to the trial court that, in light of the whole record, the request *is not unequivocal. See Stenson,* 132 Wn.2d at 740-41. Further, it is noteworthy that Turay's request to proceed without counsel was actually his third request, thereby undermining his assertion that his request was unequivocal.

The final discussion regarding whether Turay wanted to

represent himself occurred at a pretrial hearing on February 25, 1994. At that hearing, Turay again stated that he wanted the court to appoint Mestel to represent him, and he objected to the fact that the court had not appointed Mestel as his counsel. The court asked Turay, "Do you feel that you and he [the appointed attorney] are going to be able to have at least a decent attorney-client relationship?" RP (Feb. 25, 1994) at 3. Turay responded, "Yes, I don't see any problem in that, but I would still like to preserve my objections." RP (Feb. 25, 1994) at 3. Once again, Turay's statements fall short of an unequivocal request to waive his right to counsel.

In sum, when we examine the record as a whole, and in light of the presumption against waiver of right to counsel, we conclude that Turay's requests to represent himself were, at best, equivocal.[13] Accordingly, the trial court did not err in denying Turay's motions to represent himself.

---

[13]As the State points out, and the discussion above illustrates, Turay requested the appointment of three different attorneys, agreed to cooperate with appointed counsel, and declined to have his motion to act pro se be heard by the court when offered the opportunity. This scenario is analogous to *Hamilton v. Groose*, 28 F.3d 859 (8th Cir. 1994), where the Eighth Circuit Court of Appeals rejected the defendant's contention that he had been denied his Sixth Amendment right to represent himself, stating that the "equivocal way in which [the defendant] made his motion to represent himself . . . would provide the basis for a colorable Sixth Amendment claim regardless of how the trial judge had ruled." *Hamilton*, 28 F.3d at 862. The present case is comparable because Turay's request to represent himself was so equivocal that he might have had a Sixth Amendment claim if the court *had* allowed him to act pro se.

While the dissent takes issue with our holding that Turay did not make an unequivocal request to represent himself, we fail to see how, after an *objective analysis of the record as a whole*, one could arrive at this conclusion. Furthermore, we note that the dissent fails to sufficiently appreciate the strong presumption against a defendant's effective waiver of his or her right to counsel. *Brewer*, 430 U.S. at 404; *Robtoy*, 98 Wn.2d at 40. The dissenting justice contends, without citing to any authority, that "[t]he presumption against waiver of counsel is not, however, a presumption against one's substituting self-representation for retained or appointed representation. [*Brewer* and *Robtoy*] involved the waiver of the right to counsel during a *custodial interrogation*—not an election of self-representation at trial." Dissenting op. at 426 n.35. This analysis is wholly circular. If the presumption against waiver of counsel is not a presumption against self-representation, exactly what is it a presumption against? A presumption against waiver of counsel is by definition a presumption against self-representation because if one were to waive their right to counsel they would necessarily be acting pro se. In addition, contrary to the dissent's assertions, neither *Brewer* nor

## B. Admission of Testimony Regarding Turay's Prior Rape Convictions

At his second commitment trial, Turay made several motions to exclude the testimony of several of his prior rape victims, expert testimony, and other evidence relating to these prior rapes.[14] Although Turay offered to stipulate to the existence of his prior rape convictions, in order to prevent "prejudicing the jury by garnering overwhelming sympathy for [the victims,]" the State would not agree to enter into such a stipulation.[15] RP (Sept. 21, 1994) at 153. The trial court "exclude[d] any reference to non sex offenses except those that can be specifically tied, connected to [Turay's] sexual history," however, it admitted most of the evidence which Turay sought to exclude.[16] RP (Sept. 21, 1994) at 31. Turay asserts that the trial court erred in admitting this evidence because it was unfairly prejudicial under ER 403.

Turay concedes that in *Young* this court "upheld the practice of admitting testimony from prior victims of the respondent's sex crimes—rather than admitting only the fact of the Judgment—in sexual predator trials." Appellant's Opening Br. at 58. He attempts to circumvent *Young* by relying solely upon the United States Supreme

*Robtoy* were confined to circumstances involving the right to counsel during a custodial interrogation. *See, e.g., Brewer,* 430 U.S. at 404 (stating that the presumption against waiver of right to counsel "applies equally to an alleged waiver of the right to counsel *whether at trial or at a critical stage of pretrial proceedings.*") (emphasis added) (citing *Schneckloth v. Bustamonte,* 412 U.S. 218, 238-40, 93 S. Ct. 2041, 36 L. Ed. 2d 854 (1973)); *Robtoy,* 98 Wn.2d at 40 (citing *Brewer,* 430 U.S. at 404).

[14]The record indicates that Turay has three prior rape convictions.

[15]Evidence of a prior conviction for a crime of sexual violence is relevant because a sexually violent predator is defined as: "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(1).

[16]Significantly, the trial court gave a limiting instruction that the jurors were not to consider the description in a physician's (an expert witness) testimony of Turay's prior rapes "for the truth of the matter asserted but only for the purpose of assessing what weight should be given the expert witness's testimony." RP (Oct. 7, 1994) at 26.

Court's recent decision in *Old Chief v. United States*, 519 U.S. 172, 174, 117 S. Ct. 644, 136 L. Ed. 2d 574 (1997), wherein the Court held:

> The issue here is whether a district court abuses its discretion if it spurns such an offer and admits the full record of a prior judgment, when the name or nature of the prior offense raises the risk of a verdict tainted by improper considerations, and when the purpose of the evidence is solely to prove the element of prior conviction.

Turay's reliance upon this case is misplaced for several reasons. First, *Old Chief* is not entirely on point because the State's purpose for introducing prior victim testimony in SVP proceedings is not "solely" to prove the existence of a prior conviction. *Old Chief*, 519 U.S. at 174. The purpose of SVP commitment proceedings, pursuant to RCW 71.09.060(1), is for "[t]he court or jury [to] determine whether, beyond a reasonable doubt, the person is a sexually violent predator." In making this determination, the manner in which the alleged SVP committed his or her previous crimes is relevant to establish the "motivations and mental states" of that person. *Young*, 122 Wn.2d at 53. Furthermore, the prejudicial effect of introducing testimony of prior victims does not outweigh its probative value because "[i]n assessing whether an individual is a sexually violent predator, prior sexual history is *highly probative* of his or her propensity for future violence" and "the likelihood of continued violence on the part of petitioners is central to the determination of whether they are sexually violent predators under the terms of the Statute." *Young*, 122 Wn.2d at 53 (emphasis added). Accordingly, the rationale behind admitting prior victim testimony in an SVP commitment proceeding is not solely to prove the element of prior conviction, but rather to assess the mental state of the alleged SVP, the nature of his or her sexual deviancy, and the likelihood that he or she will commit a crime involving sexual violence in the future.

In addition, the other prong in the test set forth in *Old Chief* is not met here. The Supreme Court stated there

that the improper ground at issue was the possibility of "generalizing a defendant's earlier bad act into bad character and taking that as raising the odds that he did the later bad act now charged." *Old Chief*, 519 U.S. at 180. As we stated above, this simply is not the purpose of an SVP commitment proceeding because the trier of fact is not attempting to determine whether the alleged SVP committed the "bad act now charged," but is rather trying to determine whether the person suffers from a mental abnormality or personality disorder which makes them likely to engage in predatory acts of sexual violence if not confined in a secure facility. *See* RCW 71.09.020(1).

The final reason why Turay's reliance upon *Old Chief* is erroneous is that in that case the Supreme Court stated its "holding is limited to cases involving proof of felon status." *Old Chief*, 519 U.S. at 183 n.7. SVP commitment proceedings, as previously noted, do not revolve around "proof of felon status," but rather turn upon the determination of whether a particular person fits within the definition of an SVP. *See* RCW 71.09.060(1).

Finally, even assuming arguendo that *Old Chief* is applicable to SVP commitment proceedings, this court is not bound by that decision because "federal case law interpreting a federal rule is not binding on this court even where the rule is identical '[t]his court is the final authority insofar as interpretations of this State's rules is concerned.' " *State v. Copeland*, 130 Wn.2d 244, 258-59, 922 P.2d 1304 (1996) (alteration in original) (quoting *State v. Brown*, 113 Wn.2d 520, 548, 782 P.2d 1013, 787 P.2d 906, 80 A.L.R.4TH 989 (1989)); *see also Orwick v. City of Seattle*, 103 Wn.2d 249, 692 P.2d 793 (1984). Accordingly, *Old Chief*'s interpretation of FED. R. EVID. 403 does not bind this court in our interpretation of ER 403. For the aforementioned reasons, the trial court did not err in its admission of the evidence relating to Turay's prior rape victims.

## C. Exclusion at Trial of Evidence of the Conditions of Confinement at the SCC and of Evidence of the Verdict in Turay's Federal Litigation

Turay contends that the trial court committed reversible error by granting the State's motion in limine to exclude evidence of the conditions of confinement at the SCC and of the verdict in Turay's federal litigation[17] because this evidence was "relevant and powerful" and the "exclusion of powerful exculpatory evidence proffered by the defense violates the right to due process and to present a defense." Appellant's Opening Br. at 63, 64. The State counters that this evidence was properly excluded and that "Turay's argument depends on a misconstruction of the trial issues." Br. of Resp't and Cross-Appellant at 73.

Turay's arguments in regard to this issue are mer-

---

[17]Prior to Turay's commitment trial, the State made a motion in limine to exclude evidence of: (1) the conditions of confinement at the SCC; (2) whether there were less restrictive alternatives to Turay's total confinement; and (3) the verdict in Turay's federal litigation. The State argued that this evidence was not relevant to the jury's determination of whether Turay was an SVP because the focus in the commitment trial should be on Turay and whether he would be amenable to treatment in a less secure setting. The trial court partially granted the State's motion stating: "the issue for the jury is, whether or not the respondent [Turay] should be confined to a secure setting, or is there something less secure that would be in the best interest of the respondent or others. The issues regarding the type of treatment that is available are not really relevant to that consideration. I think that whether or not he is receiving the appropriate type of treatment is really an unmanageable type of decision for a jury facing the questions that this jury is going to have to face. It seems to me that if the jury determines that the respondent is a sexually violent predator, that there are no less restrictive alternatives available, then it's the Court's duty to insure that treatment occurs in that environment. Similarly, if the jury were to determine that less restrictive alternatives were appropriate, it would be the Court's duty to insure that treatment did occur in that setting. And the Court, with the assistance of the parties, would fashion such an environment for that treatment to take place. For those reasons I am going to grant the State's motion to exclude any reference to the conditions of confinement at the SCC." RP (Sept. 21, 1994) at 16-17.

The trial court also excluded evidence of the jury's verdict in Turay's federal case as irrelevant to the issues before the jury in his commitment trial. However, the court denied the State's motion to exclude evidence of whether there were less restrictive alternatives to Turay's total confinement, stating "it is the respondent's right to challenge whether or not the State has met its burden of proving that no less restrictive alternatives are appropriate. . . . So the motion to exclude that type of evidence would be denied." RP (Sept. 21, 1994) at 17-18.

itless and demonstrate a fundamental misunderstanding of the purpose of an SVP commitment proceeding.[18] The trier of fact's role in an SVP commitment proceeding, as the trial judge correctly noted, is to determine whether the defendant constitutes an SVP; *it is not* to evaluate the potential conditions of confinement. *See* RCW 71.09.060(1) (stating "[t]he court or jury shall determine whether, beyond a reasonable doubt, the person is a sexually violent predator. . . . If the court or jury determines that the person is a sexually violent predator, the person shall be committed to the custody of the department of social and health services [DSHS] for placement in a secure facility operated by the department of social and health services"). The particular DSHS facility to which a defendant will be committed should have no bearing on whether that person falls within RCW 71.090.020(1)'s definition of an SVP. Furthermore, a person committed under RCW 71.09 may not challenge the actual conditions of their confinement, or the quality of the treatment at the DSHS facility until they have been found to be an SVP and committed under the provisions of RCW 71.09. *In re Detention of McClatchey*, 133 Wn.2d 1, 5, 940 P.2d 646 (1997). As a result, the conditions at a particular DSHS facility, as well as the verdict in Turay's federal litigation, are irrelevant to the determination of whether a person fits within the statutory definition of an SVP and, therefore, the trial court properly granted the State's motion to exclude this evidence.

Turay also contends that he should have been able to introduce evidence regarding the conditions of confinement because the trial court permitted the State's expert, Dr. Dreiblatt, to testify on direct examination that "among the grounds for his diagnoses of Richard [Turay] was the fact that Richard *threatened to sue* people at SCC over the conditions of confinement." Appellant's Opening Br. at 62. Turay

---

[18]In addition, he ignores the principle that "[t]he determination of relevance is within the broad discretion of the trial court, and will not be disturbed *absent manifest abuse of that discretion." Young*, 122 Wn.2d at 53 (emphasis added) (citing *State v. Swan*, 114 Wn.2d 613, 658, 790 P.2d 610 (1990)); *see Maehren v. City of Seattle*, 92 Wn.2d 480, 488, 599 P.2d 1255 (1979).

takes Dr. Dreiblatt's testimony out of context in an attempt to buttress his argument.[19] Dr. Dreiblatt's testimony, when viewed in context, reveals that his diagnosis of Turay

---

[19]The following summary gives a more accurate representation of Dr. Dreiblatt's testimony. On direct examination, the following exchange occurred between the prosecuting attorney and Dr. Dreiblatt:

"Q: Doctor, when you left off you were talking about Mr. Turay's dementia. And we had discussed briefly personality trait disturbances associated with dementia. What I would like you to do now is, describe the personality trait disturbances associated with the dementia that you found in Mr. Turay.

"A: In Mr. Turay I found that there had been a consistent and enduring pattern of mal adaptive and inflexible behavior that kind of pervades his life . . . . The specific features that I see in terms of that mal adaptive personality involves what we call antisocial features, things such as failure to conform to social norms, deceitfulness and dishonesty, impulsivity, failure to plan ahead, irritability and aggressiveness. Disregard for the safety of others, lack of remorse about a behavior, low frustration tolerance, poor judgment. . . . I have also come to believe that there are also some, what we consider narcissistic features where a person has an exaggerated sense of their self-importance, a feeling of entitlement or exploitiveness . . . .

"Q: Doctor, you talk about the narcissistic features, giving him an exaggerated sense of self importance. Can you give us an example of what you are talking about in Mr. Turay?

"A: An example would be, I consider some of Mr. Turay's behavior at the Special Commitment Center where basically he makes threats to people, he threatens them with powers that he believes he has, threats to sue, threats to harm, things of that [sic], involves a belief, I believe, that he has an exaggerated sense of self-importance, that he is a very important person, he can do all that." RP (Sept. 28, 1994) at 108-10.

On cross-examination, the following exchange occurred between Dr. Dreiblatt and the defense counsel:

"Q: Doctor, you told the jury yesterday that you think Mr. Turay has narcissistic personality traits?

"A: Some narcissistic personality traits.

"Q: And one piece of evidence, in your mind, that he has narcissistic personality traits is, that he has threatened to sue people at the Special Commitment Center; isn't that correct?

"A: I commented that one of the things is, quality of superiority that in some ways had to do with threats to sue.

"Q: Please explain why threats to sue suggests to you a narcissistic personality trait?

"A: There are various ways someone could threaten to sue. In the notes I was looking at it was used in terms of specific situations where, basically my sense was that Mr. Turay was saying, well, I'm in control, I am in charge, don't cross me, because I can do any one of a number of things. And sue was only one of a variety of threats he made. *I mentioned several different kinds of threats*, if you fool with me, and I am paraphrasing, I will get you, I will get you later, the kind of notion I am a powerful person, who, if you mess with me, I am going to take care of you, I am going to fix you. *It wasn't specifically threats to sue*, which is one of a family of different kinds of threats that were conveying I am an important

was not influenced by Turay's decision to sue the SCC and some of its staff members. Rather, Dr. Dreiblatt determined that Turay's threats fell under an umbrella of a larger group of threats that Turay consistently made which manifested his dangerousness as an SVP. The introduction of testimony regarding an alleged SVP's mental abnormality and/or personality disorder is not only appropriate, but it constitutes the very purpose of an SVP commitment proceeding. *See* RCW 71.09.020(1); RCW 71.09.060(1). Accordingly, we affirm the trial court's granting of the State's motion to exclude evidence regarding the conditions of confinement at the SCC and the jury's verdict in Turay's federal case.

## D. Trial Court's Instructions

Turay claims that the trial court's jury instructions erroneously reduced the State's burden of proof from "beyond a reasonable doubt" to a "preponderance." Appellant's Opening Br. at 79. In support of this contention Turay asserts that "although the court's instructions to the jury recited the beyond a reasonable doubt standard of proof, they did not require the jury to find that [Turay] was a

---

person, I am in charge, I can control you people. *It wasn't specifically that statement, it was the group of things that were going on.*

"Q: What if Mr. Turay's claim was meritorious?

"A: I think the issue of whether one has a cause for suit when one is threatening people to get their own way with threats are two separate issues.

"Q: What if Mr. Turay's threat of suit is based on a real claim, based on a real violation, does that make him narcissistic?

"A: I would say that if Mr. Turay is in a prison-like environment and going around and telling people you can't do this, you can't do that, I will harm you, I will beat you up, *I will do sexual things to you*, that in no way has to do with the credit of a suit. If he has issues that he has rightfully somehow been harmed, that he is going to sue, that is a whole different issue that I am not involved with. . . . *What I considered narcissistic is, holding over the staff, if you don't do what I want I am going to either harm you or sue or get you, and I felt that that expressed a belief in his importance and specialness that fit that qualification.*" RP (Sept. 29, 1994) at 70-72 (emphasis added).

This testimony belies the dissent's claim that Turay was "[p]enaliz[ed] . . . for pursuing his legal remedies." Dissenting op. at 429. Dr. Dreiblatt's testimony demonstrates that while he considered some of the threats made by Turay, specifically those regarding physical or sexual violence, to be indicative of "antisocial behavior," he did not "penalize" Turay for threatening to sue staff at the SCC.

sexually violent predator by that strict standard of proof. . . . [because] the court instructed the jury that it might commit [him] if it found that he was a sexually violent predator by the preponderance, or more likely than not, standard." Appellant's Opening Br. at 81-82. The State counters this argument by asserting that "the jury instructions were in accordance with the law and did not reduce the State's burden of proof." Br. of Resp't and Cross-Appellant at 86.

■ RCW 71.09.060(1) provides that the "court or jury shall determine whether, beyond a reasonable doubt, the person is a sexually violent predator." RCW 71.09.020(1) defines a " 'sexually violent predator' " as "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." In accordance with these statutes, the trial court instructed the jury that:

> To find that the respondent Richard Turay is a sexually violent predator, the State must prove each of the following elements *beyond a reasonable doubt*. One, that the respondent has been convicted of a crime of sexual violence, specifically rape in the second degree; two, that the respondent suffers from a mental abnormality; and, three, that such mental abnormality makes the respondent likely to engage in predatory acts of sexual violence.

> If after weighing all of the evidence you have a reasonable doubt as to any one or more of these elements, then it will be your duty to return a verdict that the respondent is not a sexually violent predator.

RP (Oct. 7, 1994) at 15-16 (emphasis added).

The trial court's instruction mirrored the language of the SVP statute, the constitutionality of which we upheld in *Young. Young*, 122 Wn.2d at 59. Indeed, in *Young*, we

*rejected the very argument* that Turay offers here.[20] *See Young*, 122 Wn.2d at 32 n.9 (stating the statute "requires *proof beyond a reasonable doubt*"). Because we have previously considered, and rejected, the argument that Turay makes, we hold that the trial court's instructions did not reduce the State's burden to a preponderance.

### E. Annual Review

RCW 71.09.090(2) mandates that persons committed as SVPs receive an annual review hearing. At trial, Turay asserted that this statute violated equal protection because individuals committed under RCW 71.05, which governs the involuntary civil commitment of persons with serious mental disorders, receive review hearings every 180 days. The trial court agreed, and, in an attempt to cure this perceived constitutional defect, essentially grafted the 180-day review requirement of RCW 71.05 onto RCW 71.09-.090(2). Turay contends here that the trial court should have struck down RCW 71.09.090 as void in its entirety rather than judicially rewriting the statute. In the alternative, Turay contends that if we determine that the annual review provision of RCW 71.09.090 does not violate the equal protection guarantee of the United States Constitution, then we should hold that it violates the equal protection clause (article I, section 12) of Washington's Constitution.

In *Young*, we upheld the constitutionality of RCW 71.09, determining that "there are no substantive constitutional impediments to the sexually violent predator scheme." *Young*, 122 Wn.2d at 26. In addition, we stated that

---

[20]While the dissent disagrees with this conclusion, in his brief to this court, Young, like Turay in this case, claimed that RCW 71.09.060 did not impose a constitutionally adequate burden of proof because the statute "alters 'beyond a reasonable doubt' to whether the respondent is more likely than not to reoffend." *See* Br. of Resp't and Cross-Appellant, app. A, at 60. We squarely rejected that claim, however, and held that the statute was constitutional. *Young*, 122 Wn.2d at 59. Accordingly, the dissent's suggestion that *Young* did not reject the aforementioned argument is unfounded.

[a] person cannot be deprived of procedural protections afforded other individuals merely because the State makes the decision to seek commitment under one statute rather than another statute. Thus, in regard to the *initial determination* of whether there is probable cause for detention, an individual is entitled to the same opportunity to appear before the court to contest detention in any civil commitment proceeding.

*Young*, 122 Wn.2d at 45-46 (citations omitted; emphasis added). Turay claims that "[t]he same conclusion is compelled here, under the same binding precedent that compelled the *Young* decision; to paraphrase this court, 'in regard to the [postcommitment] determination of whether there is [sufficient evidence to continue] detention, an individual is entitled to the same [procedures to contest detention] in any civil commitment proceeding.' " Appellant's Opening Br. at 24 (citing *Young*, 122 Wn.2d at 45-46). Turay's reliance upon this language in *Young*, however, is erroneous because in the passage that he cited we expressly referred to the *initial determination* of probable cause, not a *subsequent recommitment*. Turay's case is, therefore, distinguishable because he is challenging the timing of his annual review hearing, rather than an initial determination of whether there is probable cause for detention.

Turay goes on to contend that his argument "is particularly true given that this Court must apply the 'strict scrutiny' test to this equal protection challenge." Appellant's Opening Br. at 24 n.2. This contention is patently erroneous. In *Young* we applied the strict scrutiny test "to the Statute as a whole." *Young*, 122 Wn.2d at 26. However, we did not apply strict scrutiny in our analysis of Young's equal protection challenge to RCW 71.09. To the contrary, a close examination of our holding indicates that we applied the rational basis test. *See Young*, 122 Wn.2d at 45 (stating " '[e]qual protection does not require that all persons be dealt with identically, but it does require that a distinction made have *some relevance* to the purpose for

which the classification is made' '') (emphasis added) (quoting *Baxstrom v. Herold*, 383 U.S. 107, 111, 86 S. Ct. 760, 15 L. Ed. 2d 620 (1966)).

■ The rational basis test was the correct standard to apply in *Young*, as it is here, because "[c]ourts have uniformly applied the rational relationship test to the statutes creating differing classes of persons for purposes of involuntary commitment statutes." *In re Detention of Patterson*, 90 Wn.2d 144, 149-50, 579 P.2d 1335 (1978), *overruled on other grounds by Dunner v. McLaughlin*, 100 Wn.2d 832, 676 P.2d 444 (1984); *see also In re Personal Restraint of Kolocotronis*, 99 Wn.2d 147, 155, 660 P.2d 731 (1983); *In re Personal Restraint of Harris*, 94 Wn.2d 430, 436, 617 P.2d 739 (1980). Moreover, in *Dydasco*, we expressly held that "[w]hen addressing the constitutionality of civil commitment statutes creating differing classes of persons, we apply *rational basis scrutiny.*" *In re Detention of Dydasco*, 135 Wn.2d 943, 951, 959 P.2d 1111 (1998) (emphasis added) (citing *Patterson*, 90 Wn.2d at 149-50).

■ ■ The rational basis standard of review is relaxed and highly deferential. *DeYoung v. Providence Med. Ctr.*, 136 Wn.2d 136, 144, 960 P.2d 919 (1998). Under this standard "a legislative classification will be upheld unless it rests on grounds wholly irrelevant to the achievement of legitimate state objectives." *State v. Thorne*, 129 Wn.2d 736, 771, 921 P.2d 514 (1996). Furthermore, the "burden is on the party challenging the classification to show that it is purely arbitrary." *Thorne*, 129 Wn.2d at 771.

■ In our view, there is a rational basis for distinguishing between SVPs and other mentally ill persons. *See Young*, 122 Wn.2d at 26 (holding that "it is irrefutable that the State has a *compelling interest* both in treating sex predators and protecting society from their actions") (emphasis added). Accordingly, in *Young* we recognized that "there are good reasons to treat mentally ill people differently than violent sex offenders." *Young*, 122 Wn.2d at 44-

45. In addition, the Legislature has specifically found that "the prognosis for curing sexually violent offenders is poor, the treatment needs of this population are very long term, and the treatment modalities for this population are very different than the traditional treatment modalities for people appropriate for commitment under the involuntary treatment act." RCW 71.09.010. Moreover, while individuals committed under the RCW 71.05 do not necessarily constitute a danger to public safety, individuals committed under RCW 71.09 are by definition dangerous to others because they have already committed at least one sexually violent act.[21] *See* RCW 71.09.020(1); RCW 71.09.030. Accordingly, there is often an extraordinarily higher public safety interest at stake when dealing with SVPs committed under RCW 71.09 than with individuals committed under RCW 71.05.

The combination of the aforementioned factors demonstrates that the annual review provision for individuals committed under RCW 71.09.090 clearly serves a "legitimate state purpose" and is in no way "arbitrary." The rational basis test is thus satisfied and, therefore, the annual commitment review hearings under RCW 71.09.090 do not violate the equal protection clause.[22]

---

[21]The State may petition to involuntarily commit a person under RCW 71.05.150(1)(a) if that person "[p]resents a likelihood of serious harm" or "is gravely disabled." The Legislature defined "likelihood of serious harm" as meaning that there is a substantial risk that the person will commit physical harm upon themselves, another person, or upon the property of others. RCW 71.05.020(14). The Legislature defined "gravely disabled" as a condition in which the person, as a result of a mental disorder, is in danger of serious physical harm because they cannot provide for their essential human needs of health or safety, or manifests severe deterioration in routine functioning so that he or she is not receiving such care as is essential for their health or safety. RCW 71.05.020(9). Accordingly, an individual committed under RCW 71.05 does not necessarily pose a threat to public safety.

[22]Authority from other jurisdictions supports this conclusion. *See People v. Williams*, 228 Mich. App. 546, 580 N.W.2d 438, 443, *appeal denied*, 589 N.W.2d 287 (1998) (holding that "a different procedure for release from detention for criminal sexual psychopathic persons than that set forth elsewhere for those acquitted on the bases of insanity and others who have been civilly committed" does not violate equal protection); *Williams v. Wallis*, 734 F.2d 1434, 1437 (11th

Finally, Turay argues that if we determine that annual review provision of RCW 71.09.090 does not violate the equal protection guarantee of the United States Constitution, then we should hold that it violates the equal protection clause of the Washington State Constitution. Although Turay engaged in the required *Gunwall*[23] analysis, his argument fails. This is so because a long line of Washington cases establishes that the two clauses have the same impact. For example, in *Housing Authority v. Saylors*, 87 Wn.2d 732, 738-39, 557 P.2d 321 (1976), we stated that "the equal protection clause of the federal constitution and the privileges and immunities clause of the state constitution are substantially identical in their impact upon state legislation." Further, we held that "[w]here language of our state constitution is similar to that of the federal constitution, we have held that the language of the state constitutional provision should receive the same definition and interpretation as that which has been given to the federal provision." *Housing Auth.*, 87 Wn.2d at 739; *see also Standing v. Department of Labor & Indus.*, 92 Wn.2d 463, 467, 598 P.2d 725 (1979) (holding that "the state [equal protection] clause usually is to be given the same interpretation as the federal clause"); *In re Application for Writ of Habeas Corpus of Olsen*, 48 Wn.2d 545, 550, 295 P.2d 324 (1956) (holding that article I, section 12 of the Washington State Constitution "is substantially identical with the equal protection clause of the fourteenth amendment"); *Texas Co. v. Cohn*, 8 Wn.2d 360, 374, 112 P.2d 522 (1941) (holding that "this court regards the equal privileges and immunities provision of Art. I, § 12, of the state constitution and the equal protection clause of the fourteenth amendment to the constitution of the United States as substantially identical").[24]

---

Cir. 1984) (holding that Alabama's release procedures for insanity acquittees did not violate the equal protection clause, even though they differed from the release procedures governing other civil committees).

[23]*State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4TH 517 (1986).

[24]The dissenting justice pays insufficient homage to the large body of case law we have cited above, which stands for the proposition that the equal protection

In summary, we believe that the annual review provision of RCW 71.09.090 clearly survives Turay's equal protection challenge.

### F. The Trial Court's Denial of Turay's Motion to Seal the Commitment Proceeding

Turay contends that the trial court erred in denying his motion to seal the commitment proceedings. He argues, in support of that motion, that because a court may seal RCW 71.05 commitment proceedings, its failure to do so here constituted a violation of equal protection.[25] The State asserts that the trial court did not err in denying Turay's

clause of the federal constitution and article I, section 12 of the Washington Constitution are substantially identical in their impact upon state legislation. Instead, the dissent asserts that article I, section 12 might provide Turay with greater protection than he would receive under the federal equal protection clause. In support of this assertion, the dissenting justice primarily relies upon the following sources: (1) dicta in *Griffin v. Eller*, 130 Wn.2d 58, 922 P.2d 788 (1996); (2) a concurring opinion in *State v. Smith*, 117 Wn.2d 263, 814 P.2d 652 (1991); and (3) *Darrin v. Gould*, 85 Wn.2d 859, 540 P.2d 882 (1975). The first two sources clearly are not binding on this court. The third source, *Darrin*, states, in relevant part, that "Const. art 1, § 12, the state's version of the equal protection clause, has been construed in a manner similar to that of the equal protection clause of the Fourteenth Amendment. Such construction, however, is not automatically compelled. Const. art. 1, § 12 may be construed to provide greater protection to individual rights than that provided by the equal protection clause." *Darrin*, 85 Wn.2d at 868 (citations omitted). This case is, however, of little precedential value, because it relies solely upon *Carter v. University of Washington*, 85 Wn.2d 391, 536 P.2d 618 (1975), to support the aforementioned statement. *Carter* is a plurality opinion, which has been *expressly overruled* by this court in *Housing Authority*. *Housing Auth.*, 87 Wn.2d at 739-40. In *Housing Authority*, a majority of this court appeared to chide the *Carter* plurality for "refusing to accept the United States Supreme Court's interpretation of constitutional requirements of equal protection." *Housing Auth*, 87 Wn.2d at 739. Furthermore, we stated that "[i]t would appear that Const. art. 1, § 12, *is less liberal* than U.S. Const. amend. 14, if a distinction between the two is to be found in the language used, for it expressly authorizes the legislature to impose terms upon the enjoyment of a privilege." *Housing Auth*, 87 Wn.2d at 740 n.3 (emphasis added). In short, although this court could certainly determine that article I, section 12 provides greater protection than the federal equal protection clause, the aforementioned case law demonstrates that heretofore we have not done so and we are not inclined to do so under these facts.

[25] We note that the trial court did not completely deny Turay's motion to seal the proceedings, but rather ruled that:

"With regard to the alternative motion to seal the court file and seal the courtroom, I would deny that motion in the form that it was made. The Court would entertain requests as to specific documents or specific testimony where a showing can be made that the right to privacy that Mr. Turay does have could

motion because "proceedings held under RCW 71.09 are presumptively open, and should not be closed to protect the reduced privacy interest of convicted sex offenders." Br. of Resp't and Cross-Appellant at 78.

The sole authority Turay cites to support this claim is *In re Detention of D.A.H.*, 84 Wn. App. 102, 924 P.2d 49 (1996). In that case, the Court of Appeals held that *probable cause hearings* under RCW 71.09.040 are presumptively closed because during the duration of that hearing an alleged SVP is similarly situated to individuals appearing at probable cause hearings under RCW 71.05, and, thus, equal protection requires that the same confidentiality and closure protections apply to both individuals. The court, therefore, reasoned that since proceedings under RCW 71.05 are presumptively closed to the public, the equal protection clause mandated that probable cause hearings under RCW 71.09.040 also be sealed. *D.A.H.* is distinguishable, however, because the Court of Appeals explicitly limited its holding in that case to *probable cause hearings* under RCW 71.09.040, and refused to extend its analysis to the actual SVP *commitment trial* under RCW 71.09.060. In addition, we note that *D.A.H.* does not appear to be consistent with case law from this court. We, therefore, question its continued validity. *See, e.g., In re Detention of Campbell*, 139 Wn.2d 341, 356, 986 P.2d 771 (1999) (holding that the trial court did not violate a sexually violent predator's privacy rights by refusing to seal his commitment proceedings because sex offenders threaten public safety and have reduced privacy interests due to the fact that the "specific modus operandi of sex offenders, preying on vulnerable strangers or grooming potential victims, is markedly different from the behavior of other types of persons civilly committed and such dangerous behavior creates a need for disclosure of information about convicted sex offenders to the public"); *In re Detention of Petersen*, 138 Wn.2d 70, 93-

---

outweigh the public interest in having access to those documents, or to that testimony. So counsel are free to raise those issues at the times that they feel are appropriate." RP (Sept. 20, 1994) at 90-91. No such request by Turay was subsequently forthcoming.

94, 980 P.2d 1204 (1999) (holding that the commitment procedures for sexually violent predators need not mirror those for individuals committed under RCW 71.05).

In the final analysis, we have a long tradition of keeping courtrooms open in this state, and there is certainly a rational basis for doing so here. *See Allied Daily Newspapers v. Eikenberry*, 121 Wn.2d 205, 211, 848 P.2d 1258 (1993) (holding that "[w]e adhere to the constitutional principle that it is the right of the people to access open courts where they may freely observe the administration of civil and criminal justice"); *Cohen v. Everett City Council*, 85 Wn.2d 385, 388, 535 P.2d 801 (1975). Accordingly, we reject Turay's claim that the trial court's refusal to seal the proceedings violated his right to equal protection.

### G. Constitutionality of the Conditions of Confinement "As Applied" to Turay

In *Young*, we held that the SVP statute, RCW 71.09, was "civil rather than criminal, and does not violate either the prohibition against ex post facto laws *or the double jeopardy clause.*"[26] *Young*, 122 Wn.2d at 59 (emphasis added). Further, in *Kansas v. Hendricks*, 521 U.S. 346, 371, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997), the United States Supreme Court held that Kansas's Sexually Violent Predator Act, which is almost identical to our SVP statute, "comports with due process requirements and neither runs afoul of double jeopardy principles nor constitutes an exercise in impermissible *ex post facto* lawmaking." Turay seemingly ignores those decisions by alleging that the conditions of confinement at the SCC violate the double jeopardy clause. He attempts to distinguish his case from *Young* and *Hendricks* by asserting that the conditions at the SCC are punitive and thereby render RCW 71.09 a criminal statute "as applied" to him, and thus violative of

---

[26]The double jeopardy clause "protects only against the imposition of multiple *criminal* punishments for the same offense." *Hudson v. United States*, 522 U.S. 93, 99, 118 S. Ct. 488, 139 L. Ed. 2d 450 (1997).

the double jeopardy clause. Appellant's Opening Br. at 39. Further, Turay claims that in order to remedy this violation of his constitutional rights, we must order his release.

The State contends that Turay "mischaracterizes the nature of his challenge and misunderstands the nature of a challenge to a statute 'as applied.' " Br. of Resp't and Cross-Appellant at 50. Specifically, the State claims that

> [a]ny alleged deficiencies in the treatment offered by the SCC do not go to deficiencies in the *Statute*, but to deficiencies in the administrative implementation of the Statute. . . . As such, a challenge to these conditions cannot properly be characterized as a challenge to the Statute "as applied."

Br. of Resp't and Cross-Appellant at 60-61. In addition, the State asserts that "any alleged inadequacies in the implementation of the Statute by government administrators, particularly when the alleged inadequacies concern conditions at a facility which are remedial in nature, cannot impact the constitutionality of the Statute itself." Br. of Resp't and Cross-Appellant at 52-53.

We believe that Turay's "as applied" double jeopardy challenge to RCW 71.09, based upon the conditions at the SCC, rather than the language of the statute, is flawed. In order to establish a double jeopardy claim, Turay must present a "high level of proof" that the statutory scheme he is challenging (RCW 71.09) is so punitive that it must be considered criminal and not civil. *Young*, 122 Wn.2d at 20; *see also Allen v. Illinois*, 478 U.S. 364, 369, 106 S. Ct. 2988, 92 L. Ed. 2d 296 (1986). In *Hudson v. United States*, 522 U.S. 93, 99, 118 S. Ct. 488, 493, 139 L. Ed. 2d 450 (1997), the Supreme Court clarified the two-part test for determining whether a particular sanction is criminal or civil for purposes of double jeopardy analysis, stating:

> A court must first ask whether the legislature, "in establishing the penalizing mechanism, indicated either expressly or impliedly a preference for one label or the other." [*United States v.*] *Ward*, 448 U.S. [242, 248, 100 S. Ct. 2636, 65 L. Ed. 2d 742 (1980)]. Even in those cases where the legislature "has

indicated an intention to establish a civil penalty, we have inquired further whether the statutory scheme was so punitive either in purpose or effect," *id.*, at 248-249, as to "transfor[m] what was clearly intended as a civil remedy into a criminal penalty," *Rex Trailer Co. v. United States*, 350 U.S. 148, 154 [, 76 S. Ct. 219, 100 L. Ed. 2d 149] (1956).

*Hudson*, 522 U.S. at 99. Further, in making the latter determination, the Supreme Court stated that " 'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Hudson*, 522 U.S. at 100 (quoting *United States v. Ward*, 448 U.S. 242, 249, 100 S. Ct. 2636, 65 L. Ed. 2d (1980)).

We applied the aforementioned double jeopardy test in *Young*, and determined that RCW 71.09 passed constitutional muster. *See Young*, 122 Wn.2d at 18-23. Furthermore, we subsequently expressly adopted this test for "the purpose of determining whether a statute is remedial or punitive under article I, section 9 of our state constitution." *Winchester v. Stein*, 135 Wn.2d 835, 845, 959 P.2d 1077 (1998); *see also State v. Catlett*, 133 Wn.2d 355, 945 P.2d 700 (1997). Accordingly, despite the fact that the case law clearly establishes the proper double jeopardy test to apply, Turay is advocating the use of an erroneous test.[27]

---

[27]Turay's claim demonstrates a misunderstanding of the nature of an "as applied" constitutional challenge to a statute. Justice Antonin Scalia, of the United States Supreme Court, set forth a basic overview of the application of an "as applied challenge" when he stated:

"Statutes are ordinarily challenged, and their constitutionality evaluated, 'as applied'—that is, the plaintiff contends that application of the statute in the particular context in which he has acted, or in which he proposes to act, would be unconstitutional. The practical effect of holding a statute unconstitutional 'as applied' is to *prevent its future application in a similar context, but not to render it utterly inoperative.* To achieve the latter result, the plaintiff must succeed in challenging the statute 'on its face.' Our traditional rule has been, however, that a facial challenge must be rejected unless there exists *no set of circumstances* in which the statute can constitutionally be applied." *Ada v. Guam Soc'y of Obstetricians & Gynecologists*, 506 U.S. 1011, 1012, 113 S. Ct. 633, 121 L. Ed. 2d 564 (1992) (Scalia, J., dissenting) (first emphasis added). While this dissenting opinion does not constitute binding authority, it does provide an excellent framework for the analysis of Turay's "as applied" challenge to the constitutionality of RCW 71.09.

In an attempt to buttress his "as applied" challenge, Turay cites *United States v. Halper,* 490 U.S. 435, 109 S. Ct. 1892, 104 L. Ed. 2d 487 (1989), *overruled by Hudson v. United States,* 522 U.S. 93, 118 S. Ct. 488, 493, 139 L. Ed. 2d 450 (1997), as standing for the proposition that a civil or criminal sanction constitutes punishment when the sanction *as applied* in the particular case serves the goals of punishment. However, in *Hudson,* 522 U.S. at 96, the Supreme Court "disavow[ed] the method of analysis used in *United States v. Halper."* The Supreme Court reasoned that the

> analysis applied by the *Halper* Court deviated from our traditional double jeopardy doctrine in two key respects. First, the *Halper* Court bypassed the threshold question: whether the successive punishment at issue is a "criminal" punishment. . . . The second significant departure in *Halper* was the Court's decision to "asses[s] the character of the actual sanctions imposed," rather than, as *Kennedy* [*v. Mendoza-Martinez,* 372 U.S. 144, 169, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963)] demanded, *evaluating the "statute on its face"* to determine whether it provided for what amounted to a criminal sanction.

*Hudson,* 522 U.S. at 101 (emphasis added) (citations omitted). Finally, the Court concluded that

> *Halper's* deviation from longstanding double jeopardy principles was ill considered. As subsequent cases have demonstrated, *Halper's* test for determining whether a particular sanction is "punitive," and thus subject to the strictures of the Double Jeopardy Clause, has proved unworkable.[28]

*Hudson,* 522 U.S. at 101-02 (footnote omitted).

 It is evident that the United States Supreme Court

---

[28]In addition, the Court stated: "Under *Halper's* method of analysis, a court must also look at the 'sanction actually imposed' to determine whether the Double Jeopardy Clause is implicated. Thus, it will not be possible to determine whether the Double Jeopardy Clause is violated until a defendant has proceeded through a trial to judgment. *But in those cases where the civil proceeding follows the criminal proceeding,* this approach flies in the face of the notion that the Double Jeopardy Clause forbids the government from even '*attempting* a second time to punish criminally.' " *Hudson,* 522 U.S. at 102 (first emphasis added).

squarely rejected the double jeopardy analysis used in *Halper*, thereby rendering Turay's citation of the case of no value. Furthermore, *Hudson* clearly stands for the proposition that, in performing double jeopardy analysis, a court must look at the statute *on its face* to determine whether it actually provides for a criminal sanction, rather than evaluating the character of the actual sanctions as imposed.[29] It is also noteworthy that the Supreme Court decided *Hudson* after *Hendricks* and yet reaffirmed its ruling that a double jeopardy challenge to a statute must be made facially rather than by assessing the character of the actual sanctions imposed i.e., as applied. *Hudson*, 522 U.S. at 100-02.

In *Winchester*, consistent with the Supreme Court's holding in *Hudson*, we expressly held that when performing double jeopardy analysis "[t]he focus . . . is on the sanction allowed by the statute, not the actual sanction imposed in a particular case." *Winchester*, 135 Wn.2d at 847. In addition, we stated that "[a] legislature's designation of a penalty as civil is entitled to considerable deference and that designation will not be overborne unless the statute,

---

[29]While one could argue that *Hudson* is distinguishable because the sanctions involved in that case were a monetary penalty and occupational disbarment, rather than confinement, such an argument would fail because the Supreme Court explicitly stated that in determining whether a statutory scheme is so punitive that it actually constitutes a criminal penalty, among the factors to be considered are whether " 'the sanction involves an affirmative disability or restraint' " and that this factor, along with the others, " 'must be considered in relation to the statute *on its face*.' " *Hudson*, 522 U.S. at 99, 100 (emphasis added) (quoting *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963)). Furthermore, the dissent's contention that Turay's as applied double jeopardy challenge is proper ignores the plain language of *Hudson*. We believe that the Supreme Court meant what it said when it mandated in *Hudson* that, when performing a double jeopardy analysis, statutes must be evaluated on their face rather than assessing the character of the actual sanctions imposed. The dissent apparently feels otherwise and attempts to buttress its view by contending that in *Hudson* the Supreme Court distinguished cases involving an affirmative disability or restraint. This is not, in our view, a correct reading of *Hudson*. In *Hudson*, the Supreme Court expressly stated that while there are several factors which serve as useful guideposts in performing a double jeopardy analysis, none of these factors, including whether the sanction involves an affirmative disability or restraint, should be evaluated to "dispositive status" or "considered controlling." *Hudson*, 522 U.S. at 101. Accordingly, the dissent's attempt to distinguish *Hudson* is unpersuasive.

considered *on its face and without reference to the level of sanction imposed in the particular case,* is clearly so punitive as to render it criminal despite the legislature's intent to the contrary." *Winchester,* 135 Wn.2d at 853 (emphasis added). Accordingly, the State is correct that Turay's "as applied" challenge relating to the administration of the statute simply does not support a double jeopardy claim.[30]

The fact that a federal court recently found that the conditions of confinement at the SCC do not yet meet constitutional standards is irrelevant to our holding here because Turay's remedy for these unconstitutional conditions is not a release from confinement.[31] Turay's remedy for unconstitutional conditions of confinement at the SCC is, therefore, an injunction action and/or an award of damages.[32] He has already received both monetary damages and an injunction via his federal litigation. Furthermore, the federal court is maintaining a zealous watch over the conditions at SCC to enforce the injunction that it put in place. Accordingly, Turay has an adequate remedy that will guarantee that the conditions at the SCC will meet or exceed constitutional standards.

---

[30]Turay also contends, that "if recent U.S. Supreme Court precedent casts doubt on the ability of a court to consider the application of a sanction in deciding whether the statute imposes punishment for double jeopardy purposes under federal law, this Court may still consider this double jeopardy question under state law, Wash. Const. art. 1, § 9." Reply Br. at 23-24. This contention is meritless because in *Winchester* we held that the test for double jeopardy is same under both the state and federal constitutions. *Winchester,* 135 Wn.2d at 845-46.

[31]This conclusion is supported by case law from other jurisdictions. In a similar case involving a sexual predator, the Wisconsin Court of Appeals held:

"[T]he State argues persuasively that even if Seibert [the sexual predator] were correct that the center failed to develop a treatment program for his special needs, his conclusion that he should be released would place society at risk for his acts of sexual violence and produces an absurd result. Rather, they argue, his remedy is to litigate that issue and, if successful, obtain appropriate treatment, not supervised release. We agree." *State v. Seibert,* 220 Wis. 2d 308, 582 N.W.2d 745, 749, *review denied,* 220 Wis. 2d 366, 585 N.W.2d 158 (1998); *see also Carson v. Johnson,* 112 F.3d 818, 820 (5th Cir. 1997) ("Generally, § 1983 suits are the proper vehicle to attack unconstitutional conditions of confinement").

[32]In addition, as the Supreme Court noted in *Hudson,* the "Due Process and Equal Protection Clauses already protect individuals from sanctions which are downright irrational." *Hudson,* 522 U.S. at 103 (citing *Williamson v. Lee Optical of Okla., Inc.,* 348 U.S. 483, 75 S. Ct. 461, 99 L. Ed. 563 (1955)).

We are not unmindful of the fact that the Ninth Circuit Court of Appeals has recently held that *Hendricks* "does not preclude the possibility that the Washington [SVP] statute, *as applied*, is punitive."[33] *Young v. Weston*, 176 F.3d 1196, 1199, *amended by* 192 F.3d 870 (9th Cir. 1999). This court is, of course, not bound by that decision and, for the aforementioned reasons, we decline to follow it. Assuming arguendo, however, that the Ninth Circuit is correct that a person committed as an SVP under RCW 71.09 may challenge that statute as violative of double jeopardy "as applied to them," rather than facially, Turay's claim would still be unsuccessful.

As previously noted, in order to prevail on a double jeopardy claim, "a party challenging the statute [must] provide[ ] 'the clearest proof' that 'the statutory scheme [is] so punitive either in purpose or effect as to negate [the State's] intention' to deem it 'civil.' " *Hendricks*, 521 U.S. at 361 (alteration in original) (quoting *Ward*, 448 U.S. at 248-49); *see also Young*, 122 Wn.2d at 19-20. Accordingly, Turay must prove not only that the conditions of his confinement are constitutionally deficient in some manner, but that these deficiencies are "so punitive" that they wholly render the application of RCW 71.09 criminal rather than civil.

Turay has clearly failed to carry his burden of proof. This conclusion is evidenced by the fact that the trial court expressly held that the SCC's failure to provide Turay, in some respects, with constitutionally adequate treatment did not render RCW 71.09 punitive as applied. Further, the federal district court, noting that "[p]rogress has been made since the October 1998 hearing toward compliance with the injunction[,]" has also refused to find that the conditions at the SCC mandate Turay's release. *Turay v.*

---

[33]It is significant, however, that in *Hendricks*, the Supreme Court flatly rejected Hendricks's contention that the SVP statute *"as applied to him . . . violates double jeopardy principles* because his confinement under the Act, imposed after a conviction and a term of incarceration, amounted to both a second prosecution and a second punishment for the same offense." *Hendricks*, 521 U.S. at 369 (emphasis added).

*Weston*, No. C91-664WD (W.D. Wash. 1994), Order on Renewed Mots. for Contempt (May 27, 1999) at 3. In addition, the federal court, as noted above, will continue to monitor the SCC's progress toward compliance with the injunction in order to ensure that Turay receives constitutionally adequate care. As a result, it is evident the deficiencies in Turay's treatment at the SCC are in the process of being remedied. We agree, therefore, with the trial court and the federal district court's refusal to order Turay's release. Accordingly, even if Turay's "as applied" challenge to RCW 71.09 is proper, he has failed to establish by "the clearest proof" that the deficiencies in his treatment at the SCC render that statute "so punitive" that it is actually criminal in nature and, therefore, requires his release. *See Campbell*, 139 Wn.2d at 349 (citations omitted) (holding that, to the extent that the defendant's claim was proper, he had failed to sufficiently prove that the conditions of confinement at the SCC constitute punishment so as to render RCW 71.09 criminal in nature and unconstitutional as applied to him).

In short, we reject Turay's claim that the conditions of confinement at the SCC are punitive "as applied" to him and thus violative of the double jeopardy clause. Further, we deny his effort to have us overrule our decision in *Young*, insofar as a facial challenge to RCW 71.09 is concerned. Turay's remedy for the unconstitutional conditions is a § 1983 suit or an injunction action, such as he has already instituted.

### III. SUBSTANTIVE ISSUES RAISED BY THE STATE
### A. Annual Review

The State contends that the trial court erred when it concluded that the annual review provision of RCW 71.09.090(2) violated equal protection and, as a result, grafted the 180-day review requirement of RCW 71.05 onto RCW 71.09.090(2). As we have previously discussed, the annual review provision of RCW 71.09.090(2) does not violate equal protection. Accordingly, we overrule the trial

court's attempt to judicially amend RCW 71.09.090(2) to require review every 180 days.

## B. Burden of Proof at the Show Cause Hearing under RCW 71.09.090(2)

▇▇▇ As previously stated, RCW 71.09.090(2) provides that an individual committed under RCW 71.09 is entitled to an annual show cause hearing "to determine whether facts exist that warrant a hearing on whether the person's condition has so changed that he or she is safe to be conditionally released to a less restrictive alternative or unconditionally discharged." The trial court held that this statute does not clearly state which party bears the burden of proof at the show cause hearing, and thus "[t]o the extent that the burden of proof is placed upon the respondent, the statute violates his due process rights." CP at 1157. As a result, the trial court ruled that *"the burden is on the state* to show that the respondent is currently suffering from a mental abnormality or personality disorder which makes the respondent likely to engage in predatory acts of sexual violence if conditionally released to a less restrictive alternative or unconditionally discharged." CP at 1157 (emphasis added). The State argues that the trial court erred in this ruling, but that

> should this Court determine that the trial court was correct and that due process requires the State to bear the burden of proof at the show cause hearing, no action on this case is warranted. Since the trial court required the State to bear the burden of proof at Turay's show cause hearing, Turay has suffered no prejudice.

Br. of Resp't and Cross-Appellant at 38.

The United States Supreme Court has unequivocally held that "in civil commitment proceedings *the State must establish* the grounds of insanity and dangerousness permitting confinement by clear and convincing evidence." *Foucha v. Louisiana*, 504 U.S. 71, 86, 112 S. Ct. 1780, 118 L. Ed. 2d 437 (1992) (emphasis added). This language clearly

indicates that due process requires the State to bear the burden of proof in all civil commitment proceedings, thereby buttressing the ruling of the trial court. Furthermore, in *Young*, we held that "before a person can be civilly committed, *the State must prove* that the individual is mentally ill and dangerous." *Young*, 122 Wn.2d at 37 (emphasis added; footnote omitted). Accordingly, both this court and the United States Supreme Court agree that the State must bear the burden of proof in involuntary civil commitment hearings, and, therefore, the trial court was correct in determining that due process requires that the burden of proof remain upon the State in the show cause hearing. We, therefore, reject the State's contention that it does not have to bear the burden of proof in show cause hearings held pursuant to RCW 71.09.090.

## CONCLUSION

Turay raised a plethora of issues regarding the validity of his continued confinement at the SCC pursuant to the 1994 order of commitment that the King County Superior Court entered against him. For the reasons we have set forth above, we conclude that the record in this case supports the order of commitment, and, therefore, we affirm that order. We further conclude that the trial court erroneously determined that RCW 71.09.090's annual review provision violated Turay's right to equal protection, and, thus, we overrule the trial court in respect to that issue. Finally, we affirm the trial court's ruling that the State must bear the burden of proof in show cause hearings held pursuant to RCW 71.09.090(2).

GUY, C.J., SMITH, JOHNSON, and TALMADGE, JJ., and DOLLIVER, J. PRO TEM., concur.

MADSEN, J. (concurring in the dissent) — For the reasons stated in my concurrence in the dissent in *In re Detention of Campbell*, 139 Wn.2d 341, 986 P.2d 771 (1999), I also dissent from the majority in this case.

SANDERS, J. (dissenting) — Under the guise of a civil commitment facially justified to accomplish remedial treatment, not punishment, Richard Turay challenges not only the procedure by which he was imprisoned but the abject refusal of the trial court to substantively consider the actual conditions of his confinement. I will highlight my critical disagreements with the majority under appropriate headings, attempting to follow the majority's order of presentation.

## I
## Denial of Motion to Vacate is an Appealable Order

At the threshold, the majority diminishes the prisoner's access to whatever justice may be provided through appellate review by claiming this prisoner's appeal from the order of May 9, 1996 denying his motion to vacate the judgment of commitment cannot be pursued as a matter of right, but only by discretionary review. The order sought to be reviewed denied Turay's motion to vacate this judgment of commitment based upon proof of the punitive conditions, and lack of treatment, associated with the prisoner's actual confinement. Clerk's Papers (CP) at 949 ("to vacate the RCW 71.09 commitment of Mr. Turay."). The trial court excluded this evidence during the trial in chief causing Turay to subsequently file a motion to vacate on this ground. Pursuant to RAP 2.2(a)(10), "An order granting or denying a motion to vacate a judgment" is appealable as a matter of right; therefore the order denying Turay's motion to vacate is also appealable of right.

## II
## Constitutional Right to Represent Oneself

The Sixth and Fourteenth Amendments of the United States Constitution guarantee the right to counsel in state proceedings where liberty is at stake. *Tetro v. Tetro*, 86 Wn.2d 252, 544 P.2d 17 (1975). This right to counsel includes the right to represent oneself in the alternative to utilizing a retained or appointed counsel. *Faretta v. Califor-*

*nia,* 422 U.S. 806, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (1975). Although we might question Turay's choice to represent himself, Turay does have the absolute constitutional right to waive the assistance of retained or appointed counsel:

> The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master; and the right to make a defense is stripped of the personal character upon which the Amendment insists.

*Id.* at 820 (footnote omitted). That is not to say there is no required form in which the right to self-representation must be asserted. Rather, the request "must be knowing and intelligent, timely and not for the purpose of delay, and unequivocal." *Adams v. Carroll,* 875 F.2d 1441, 1442 (9th Cir. 1989) (citations omitted).[34]

Essentially the majority finds no error on review of the trial court's denial of Turay's request to self-representation, asserting this request was "equivocal" in the sense that it was posed in the alternative to representation by counsel of his choice. ("He prefaced this comment [" 'to represent myself with standby counsel' "], however, with several requests to have Mark Mestel, an attorney who had represented him at his first commitment trial, represent him again." Majority at 396.).

When Turay learned his attorney of choice was unavail-

---

[34]The majority asserts that "the dissent fails to sufficiently appreciate the strong presumption against a defendant's effective waiver of his or her right to counsel." Majority at 399 n.13 (citing *Brewer v. Williams,* 430 U.S. 387, 404, 97 S. Ct. 1232, 51 L. Ed. 2d 424 (1977) and *State v. Robtoy,* 98 Wn.2d 30, 40, 653 P.2d 284 (1982)). The presumption against waiver of counsel is not, however, a presumption against one's substituting self-representation for retained or appointed representation. These cases involved the waiver of the right to counsel during a *custodial interrogation*—not an election of self-representation at trial. The majority cites no authority to support the claim that one is presumed not to elect self-representation at trial.

able, he unequivocally requested the court to permit him to proceed pro se: "I don't even know if I got a decision from you yet whether it's possible to represent myself." Videotape Recorded Proceedings (VRP) (Nov. 16, 1993) at 11. Yet the trial court refused to consider Turay's request: "All I want you to do is work with Ms. Shaw. We don't have time right now, given the lateness of the hour, to go into all of this. . . . Work with her. I think everything would go faster, it would go smoother." *Id.*

Notwithstanding, Turay persisted and again pressured the court to decide his motion for self-representation:

> You still haven't ruled yet on whether I can—and I had the motion here and you said last week you didn't want to hear it, and I brought it back with me again. This motion is to represent myself with a standby counsel.

*Id.* at 12-13. While Turay clearly wanted Mestel appointed, equally clear was his desire to represent himself in the event the court denied his motion for substitute counsel.

A conditional request is not an equivocal one. *Adams* is directly on point. In *Adams* the Ninth Circuit examined whether "a request to proceed without counsel [is] unequivocal where the defendant consistently wishes to invoke the right only as an alternative to the appointment of a particular defense attorney." *Adams*, 875 F.2d at 1442. The court held an alternative request is *not* thereby rendered an equivocal one.

> Throughout the period before trial, Adams repeatedly indicated his desire to represent himself if the only alternative was the appointment of Carroll. While his requests no doubt were *conditional*, they were not equivocal.

*Id.* at 1445.[35]

Although the majority asserts Turay was "ambivalent

---

[35]The majority points to Turay's February 1994 motion as evidence of his equivocation. "Further, it is noteworthy that Turay's request to proceed without counsel was actually his third request, thereby undermining his assertion that his request was unequivocal." Majority at 398. But three requests seem more emphatic than one.

about whether he would accept the appointment of substitute counsel" (Majority at 397), the record reflects Turay consistently resisted the court's efforts to appoint an attorney other than Mestel.[36] In fact, Turay clearly articulated his reasons for declining Ms. Shaw's representation: "[S]he's probably a real smart person, you know, but there are several people out at the Special Commitment Center that are doing a life sentence because the Public Defender's Office has represented 'em." VRP (Nov. 16, 1993) at 7.

Even assuming Turay agreed to cooperate with Ms. Shaw, this does not render equivocal his persistent requests to proceed pro se. " 'After a clear denial of the request [to proceed pro se], a defendant need not make fruitless motions or forego cooperation with defense counsel in order to preserve the issue on appeal.' " *United States v. Arlt*, 41 F.3d 516, 523 (9th Cir. 1994) (emphasis omitted) (quoting *Brown v. Wainwright*, 665 F.2d 607, 612 (5th Cir. 1982)).

As the trial court unquestionably denied Turay's request to represent himself,[37] it should be equally clear Turay made the request. Turay's attempt to make the best of his remaining options does not make his prior request "equivocal."

The Supreme Court recently reaffirmed denial of the right to self-representation is not subject to a harmless error analysis but is "subject to automatic reversal." *Neder v. United States*, 527 U.S. 1, 8, 119 S. Ct. 1827, 1833, 144 L. Ed. 2d 35 (1999). Turay's commitment must therefore be reversed on this ground if no other.

---

[36]*See* VRP (Nov. 16, 1993) at 6 (Turay asked the court if "You think we could just maybe postpone this [appointing Ms. Shaw] for a little bit until you find out from Mark of what's going on instead of coming to any hasty decision?"); *see also* VRP (Nov. 16, 1993) at 14 (Turay stated, "As long as the Court realizes that, you know, I haven't made that decision [to work with Ms. Shaw]. . . . I could probably make a decision after we talked. . . . I—I'm not going to, you know, say no to that, but, at the same time, I don't want—I would ask that this Court not make any ruling that she is appointed by the court as my counsel, though.").

[37]*See* Verbatim Report of Proceedings (RP) (Feb. 25, 1994) at 2 ("THE COURT: The reason I asked for this hearing is because of the concerns that we dealt with the last time we were here and, in particular, Mr. Turay, *you had made a request to go pro se. I denied that request*.").

## III
## Penalizing Turay for Pursuing his Legal Remedies

The trial court granted the State's motion in limine to exclude testimony regarding the actual conditions of Turay's confinement, and also denied Turay the right to rebut the State's expert witness, Dr. Irwin Dreiblatt, who testified to the effect Turay was suffering from a mental disorder justifying commitment evidenced by, amongst other things, "threats to sue." Verbatim Report of Proceedings (RP) (Sept. 28, 1994) at 110. These threats to sue in part led Dr. Dreiblatt to testify, "he has an exaggerated sense of self-importance, that he is a very important person, he can do all that." *Id.*

In a sense I agree with Dr. Dreiblatt. In a free society every individual including Turay *is* "a very important person," at least one indication of that importance being the unfettered right to access the courts to remedy one's legal grievances.

> "[E]very prisoner has a constitutional right of access to the courts to present any complaints he might have concerning his confinement. He cannot be disciplined in any manner for making a reasonable attempt to exercise that right. Access to the courts is a fundamental precept of our system of government. No citizen, regardless of his transgressions, is ever to be legally consigned to the total and unreviewed power of any single branch of government."

*Inmates of Neb. Penal & Correctional Complex v. Greenholtz*, 436 F. Supp. 432, 436 (D. Neb. 1976) (quoting *Andrade v. Hauck*, 452 F.2d 1071, 1072 (5th Cir. 1971)), *aff'd*, 567 F.2d 1381 (8th Cir. 1977). *See also Burns v. Swenson*, 430 F.2d 771 (8th Cir. 1970).

But it is of supreme irony, in light of Dr. Dreiblatt's testimony, that Turay's federal lawsuit against the commitment center, and certain individuals associated with the center, was successful. This evidence was excluded from the trial even though it would have demonstrated not only Turay's rational decision to seek legal redress but also the

merit of his claim. Notwithstanding, the trial judge withheld this part of the story from the jury, allowing Dr. Dreiblatt to get away with characterizing this man as a sex predator, at least in part, because he attempted to legally defend himself against what all seem to concede are unconstitutional conditions of confinement.[38] The exclusion of Turay's rebuttal is especially aggravated in view of Dr. Dreiblatt's admission that threats to sue with a meritorious basis are *not* indicative of a narcissistic personality. RP (Sept. 29, 1994) at 72 ("I wouldn't consider that narcissistic.").

The majority contends, "Dr. Dreiblatt determined that Turay's threats fell under an umbrella of a larger group of threats that Turay consistently made" (Majority at 406), and Dr. Dreiblatt's diagnosis of Turay was not even "influenced" by his threats to sue. But in fact it was *Dr. Dreiblatt's* testimony that he *considered* Turay's threats to sue as one factor in "the group of things that were going on" (RP (Sept. 29, 1994) at 71), and therefore his testimony must have been "influenced" by these threats.

The trial court erred not because it allowed Dr. Dreiblatt to testify without objection but because it prevented any rebuttal from Turay. This denied Turay the right to mount a defense. "Few rights are more fundamental than that of an accused to present witnesses in his own defense." *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973) (citations omitted). The right to present witnesses is particularly important when a witness would rebut or explain evidence introduced by the government from which the jury might infer an element of the offense. *See, e.g., United States v. Whitman*, 771 F.2d 1348, 1351 (9th Cir. 1985) (error to prevent defendant from rebutting evidence introduced by the government from which jury

---

[38]Not only did the State's testimony open the door to Turay's proposed rebuttal, which would have included an explanation about the factual basis for such a suit, but it highlights so-called expert testimony which draws an adverse psychological inference from the exercise of a prisoner's legal rights. Such testimony continues an unfortunate and dangerous trend. *Cf. In re Detention of Petersen*, 138 Wn.2d 70, 71 n.21, 980 P.2d 1204 (1999) (Sanders, J., dissenting).

might infer motive); *United States v. Armstrong*, 621 F.2d 951, 953 (9th Cir. 1980) (error to exclude testimony that another man fit the description of the robber and used "bait" money to buy car).

The majority itself recognizes "[t]he introduction of testimony regarding an alleged SVP's [sexually violent predator] mental abnormality and/or personality disorder is not only appropriate, but it constitutes the very purpose of an SVP commitment proceeding." Majority at 406. But the majority denies Turay the right to discredit Dr. Dreiblatt's testimony, or even challenge factual assumptions which underlie it, with evidence of the actual conditions of confinement about which Turay justly complained. Exclusion of Turay's proposed testimony therefore left unchallenged, and immunized, the inference of a "mental abnormality" based on Turay's "narcissistic" promises to sue.

## IV
### Beyond a Reasonable Doubt Means Beyond a Reasonable Doubt

The court instructed the jury:

> To find that the respondent Richard Turay is a sexually violent predator, the State must prove each of the following elements beyond a reasonable doubt. One, that the respondent has been convicted of a crime of sexual violence, specifically rape in the second degree; two, that the respondent suffers from a mental abnormality; and, three, that such mental abnormality makes the respondent *likely* to engage in predatory acts of sexual violence.

> If after weighing all the evidence you have a reasonable doubt as to any one or more of these elements, then it will be your duty to return a verdict that the respondent is not a sexually violent predator.

RP (Oct. 7, 1994) at 15-16 (emphasis added).

Turay persuasively argues this jury instruction, when read as a whole, lowers the burden of proof to a mere preponderance standard:

> [A]lthough the court's instructions to the jury recited the beyond a reasonable doubt standard of proof, they did not require the jury to find that Richard was a sexually violent predator by that strict standard of proof.
>
> . . . .
>
> A 100 percent certainty that there is a 51 percent chance that someone will commit predatory sexual acts in the future still demands only a 51 percent certainty.

Appellant's Opening Br. at 81-82.[39] We upheld this statute only against facial constitutional attack by holding "[t]he burden is on the State to prove, beyond a reasonable doubt, that the detainee is a sexually violent predator. RCW 71.09.060(1)."[40] *In re Personal Restraint of Young*, 122 Wn.2d 1, 13, 857 P.2d 989 (1993). But here the prosecutor emphasized this instruction because it included the word "likely" to argue that burden had been reduced to a mere preponderance by rhetorically asking in closing argument: "[A]re you convinced that more likely than not at some future point in the future he will attempt to commit or commit a predatory act of sexual violence?" RP (Oct. 7, 1994) at 117-18; and stating, "If you believe respondent is likely to commit an act of sexual violence, that's all that's meant." *Id.* at 37.

Due process guarantees an accused be protected "against conviction except upon proof beyond a reasonable doubt of *every fact* necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970) (emphasis added). Even under the language of this statute the prospect of reoffense is an essential fact to be proved "beyond a reasonable doubt." RCW 71.09.060(1). If we endorse a lower burden of proof we circumvent the statute, *Young*, and *Winship*, thereby permitting the state to indefinitely confine an individual on

---

[39]The jury was instructed separately that "likely" is defined as "a proposition [that] is more probably true than not." RP (Oct. 7, 1994) at 18.

[40]RCW 71.09.060(1) expressly provides, "The court or jury shall determine whether, beyond a reasonable doubt, the person is a sexually violent predator."

a "more likely than not" flip of the coin rather than strictly limiting commitment to only those who will otherwise reoffend "beyond a reasonable doubt."[41] As held in *Young* and *Winship*, when an accused is entitled to greater protection than that provided by the simple preponderance standard, an instruction which allows commitment on a mere preponderance is serious and reversible error. *Winship*, 397 U.S. at 363; *see also Sullivan v. Louisiana*, 508 U.S. 275, 113 S. Ct. 2078, 124 L. Ed. 2d 182 (1993) (holding constitutionally deficient reasonable doubt instruction required automatic reversal), *cert. denied*, 523 U.S. 1061, 118 S. Ct. 1390, 140 L. Ed. 2d 649 (1998).

The majority summarily dismisses Turay's argument that the jury instructions erroneously reduced the burden of proof from "beyond a reasonable doubt" to a "preponderance" standard "[b]ecause we have previously considered, and rejected, the argument that Turay makes, we hold that the trial court's instructions did not reduce the State's burden to a preponderance." Majority at 408 (citing *Young*, 122 Wn.2d at 32 n.9). Not so.

*Young* did not reject this argument, in fact it expressly required proof beyond a reasonable doubt to honor the statutory requirement set forth in RCW 71.09.060(1) and to save the statute from constitutional infirmity. The language relied upon by this majority was written by *Young*'s majority in a footnote to respond to the dissent's contention the sex predator act facially violates substantive due process. That footnote emphasized the beyond-a-reasonable-doubt standard as a rebuttal to claims of facial invalidity:

The dissent seriously underplays the quantum of proof neces-

---

[41]*See State v. Perez*, 90 Haw. App. 113, 128-29, 976 P.2d 427 (1998) (court's instruction jury must convict if "firmly convinced" of guilt diminished the very high burden of proof of beyond a reasonable doubt to that of clear and convincing evidence and constituted reversible error), *aff'd in part, rev'd in part*, 90 Haw. 65, 67, 976 P.2d 379 (1999); *see also State v. Baker*, 309 S.C. 436, 437, 424 S.E.2d 492 (1992) (instruction defining reasonable doubt as a "doubt arising from the evidence presented or lack of evidence that created a strong uncertainty in your minds" as to guilt violated due process as finding of guilt could be based on degree of proof below that required by the due process clause).

sary to meet the dangerousness prong of the sex predator statute. The State must do far more than merely reprove a past criminal act, or present testimony from someone who thinks that individual is still dangerous. See dissent, at 62-65. Instead, the statute requires *proof beyond a reasonable doubt* that the person has been convicted or charged with a crime of sexual violence, and suffers from a mental abnormality or personality disorder "which makes the person likely to engage in predatory acts of sexual violence." RCW 71.09.020(1).

*Young*, 122 Wn.2d at 32 n.9. *Young* thus expressly *adopted* the "beyond a reasonable doubt" standard; it certainly did not endorse an instruction phrased to defeat that standard.

And there is another reason why this error is so prejudicial: If an individual is indeed suffering from a mental condition that "makes" him likely to commit future acts of predatory violence, RCW 71.09.020(1), the existence of that volitional impairment must be proved beyond a reasonable doubt because this statute envisions future acts of sexual violence are a necessary and *defining* characteristic of the mental abnormality which makes commitment appropriate. If we relax this standard our net catches not only those who will not necessarily reoffend as a result of an alleged mental condition but also dilutes the statutory definition of the necessary mental disorder.

A proper burden of proof instruction under this statute therefore also serves to focus and define the condition at issue to the exclusion of speculation based upon prior conduct indicative of simple volitional propensity. *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995) ("[E]vidence of other crimes, wrongs, or acts is presumptively inadmissible to prove character and show action in conformity therewith. ER 404(b)"); *State v. Holmes*, 43 Wn. App. 397, 400, 717 P.2d 766 (1986) ("When the sole purpose of the other crimes evidence is to show . . . propensity . . . there is no room for ad hoc balancing. The evidence is then unequivocally inadmissible . . . ." (quoting McCormick on Evidence § 190, at 565 (Edward W. Cleary ed., 3d ed. 1984))); *State v. Irving*, 24 Wn. App. 370, 375, 601 P.2d 954 (1979) (propen-

sity evidence obscures the peg of relevancy "by the dirty linen hung upon it.").

The necessity in a sex predator proceeding to distinguish evidence of a mental defect that "makes one reoffend" from simple propensity evidence that "one will probably reoffend in the future because he has offended in the past" is a distinction of critical importance in the case before us. Propensity evidence is *not* and cannot be evidence that one meets the statutory definition of "sexually violent predator" as one "who suffers from a mental abnormality or personality disorder which *makes* the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(1) (emphasis added).

Even if it were reasonable to assume Turay might reoffend because he has offended before, the statutory standard is not satisfied unless the prospect of reoffense is specifically *caused* by "a mental abnormality or personality disorder . . . ." This requires proof not only that the disorder exists but that the disorder, in and of itself, causes one to reoffend in the same sense that a cold causes the sniffles. It is therefore facially insufficient to demonstrate only that one has a disorder and that one will reoffend absent further proof, beyond a reasonable doubt, that the first causes the second. But evidence of this causal link is absent from this record, and specifically absent from the testimony of the state's expert. Dr. Dreiblatt testified that in his opinion Turay would reoffend not because the diagnosed disorder necessarily caused one to reoffend but because one who offended in the past is more likely to offend in the future, i.e., propensity:

> If there is one finding that overshadows all others in the area of prediction it is that the probability of future crimes increases with each prior criminal act. . . . [I]f a person is arrested four times, the probability that it will happen a fifth time is eighty percent. If a person is arrested ten times, the probability of an 11th arrest is ninety percent.

RP (Sept. 29, 1994) at 98. Even if this is true it does not

prove the statutory element, that the mental disorder "makes" the individual reoffend. Thus, the instruction as given obscures the statutory requirement that the disorder *cause* one to reoffend as distinguished from proof of the prospect of reoffense due to simple propensity.

This instruction could be easily cured by simply reforming the last phrase to delete "likely to," thus making it read, "that such mental abnormality makes the respondent engage in predatory acts of sexual violence." Such would preserve the reasonable doubt standard thereby accurately restating the statutory elements in the context of the constitutional burden of proof. An appropriate instruction would then read:

> To find that the respondent Richard Turay is a sexually violent predator, the State must prove each of the following elements beyond a reasonable doubt. One, that the respondent has been convicted of a crime of sexual violence, specifically rape in the second degree; two, that the respondent suffers from a mental abnormality; and, three, *that such mental abnormality makes the respondent engage in predatory acts of sexual violence.*

## V
### Release is the Remedy for Unconstitutional Confinement

Turay contends release is the remedy to confinement under unconstitutional conditions. I agree but the majority does not. The majority follows closely the analysis set forth in the companion case of *In re Detention of Campbell*, 139 Wn.2d 341, 986 P.2d 771 (1999), which it cites for authority, Majority at 422, just as *Campbell* cites *Turay v. Weston*, No. C91-664WD (W.D. Wash. 1994), for its authority. *In re Detention of Campbell*, 139 Wn.2d at 348-49. However this majority at least admits the holding in *Young v. Weston*, 176 F.3d 1196, *amended by* 192 F.3d 870 (9th Cir. 1999) (hereinafter "*amended* (Sept. 16, 1999)") is contrary to its position, whereas the majority in *Campbell* inconsistently attempts to distinguish it.

Where the majority opinion here is similar to the major-

ity opinion in *In re Detention of Campbell*, I rely on my dissent in *Campbell* to adequately respond to the majority's misbegotten claim that the Constitution of our country does not protect individuals from unconstitutional confinement. But I here additionally respond to this majority's unique claim that an "as-applied" double jeopardy challenge must always fail as a matter of law.

The majority contends *Hudson v. United States*, 522 U.S. 93, 118 S. Ct. 488, 139 L. Ed. 2d 450 (1997) stands for the proposition that "a double jeopardy challenge to a statute must be made facially rather than by assessing the character of the actual sanctions imposed, i.e., as applied." Majority at 419. The United States Court of Appeals in *Young* considered and then rejected this precise argument:

> Relying on *Hudson v. United States*, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), Washington argues that the conditions of confinement are irrelevant to the court's [double jeopardy] inquiry. We disagree. Whereas *Hudson* involved monetary penalties and disbarment, see id. at ___, 118 S. Ct. at 493, this case involves confinement. In cases considering the question whether confinement is criminal or civil, the Supreme Court has always looked to the actual conditions of confinement. *See, e.g.* [*Kansas v.*] *Hendricks*, 521 U.S. [346,] at 361-67, 117 S.Ct. [2072,] at 2082-85 [, 138 L.Ed.2d 501 (1997)]; *Allen v. Illinois*, 478 U.S. 364, 373-74, 106 S. Ct. 2988, 92 L. Ed. 2d 296 (1986); *see also Bell v. Wolfish*, 441 U.S. 520, 535-39 [, 99 S.Ct. 1861, 60 L.Ed. 2d 442] (197[9]).

*Young*, 176 F.3d at 1199 n.4, *amended* (Sept. 16, 1999).

*Hudson* questioned whether the previous imposition of civil monetary penalties raised a double jeopardy bar to subsequent criminal prosecution for illegal loans. It confined its analysis to answer the narrow issue " 'whether the imposition upon petitioners of monetary fines as *in personam* civil penalties by the Department of the Treasury, together with other sanctions, is "punishment" for purposes of the Double Jeopardy Clause.' " *Hudson*, 522 U.S. at 101-02 n.5. *Hudson*'s majority specifically distinguished the sanctions imposed there—civil fine—from the

sanction here—imprisonment: "While petitioners have been prohibited from further participating in the banking industry, this is 'certainly nothing approaching the "infamous punishment" of imprisonment.'" *Id.* at 104 (quoting *Flemming v. Nestor*, 363 U.S. 603, 617, 80 S. Ct. 1367, 4 L. Ed. 2d 1435 (1960)). That is the key distinction which our majority fails to credit.

While recognizing that "at least initially" the criminal versus the civil nature of the original sanction is a matter of statutory construction, 522 U.S. at 99, the Supreme Court, unlike the majority here, also recognizes that even if the initial sanction resulted from a statute facially civil in nature, that does not end the inquiry but rather requires an answer to the further question "'whether the statutory scheme was so punitive either in purpose or *effect*,' . . . as to 'transfor[m] what was clearly intended as a civil remedy into a criminal penalty,'" 522 U.S. at 99 (alteration in original) (emphasis added) (citations omitted). Answering that latter question the Supreme Court employed the "useful guideposts" of the analysis set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 168-69, 83 S. Ct. 554, 9 L. Ed. 2d 644 (1963) including:

> (1) "[w]hether the sanction involves an affirmative disability or restraint"; (2) "whether it has historically been regarded as a punishment"; (3) "whether it comes into play only on a finding of *scienter*"; (4) "whether its operation will promote the traditional aims of punishment—retribution and deterrence"; (5) "whether the behavior to which it applies is already a crime"; (6) "whether an alternative purpose to which it may rationally be connected is assignable for it"; and (7) "whether it appears excessive in relation to the alternative purpose assigned."

*Hudson*, 522 U.S. at 99-100 (citing *Kennedy*, 372 U.S. at 168-69).

Although the Supreme Court was not persuaded the monetary penalty at issue in *Hudson* was a criminal sanction in actual effect, the *Hudson* analysis, which relied upon the *Mendoza* factors, specifically distinguished punishment which "involve[s] an 'affirmative disability or

restraint,' as that term is normally understood," *Hudson*, 522 U.S. at 104 (quoting *Flemming*, 363 U.S. at 617), from monetary assessments. The distinction between a monetary assessment on the one hand and punitive incarceration on the other was fundamental to the Supreme Court's analysis in *Hudson*, as it was equally fundamental to the United States Court of Appeals' analysis in *Young.* Yet this distinction is conspicuous by its absence from the majority opinion here. By analogy this distinction between superficial form and substantive effect might be illustrated by the personal injury victim whose ambulance is misdirected from the hospital to the maximum security prison where he is not only denied treatment but indefinitely confined under the most punitive of prison regimes. In such a situation the court must look to the actual conditions of confinement, not the hypothetical destination of the ambulance.

The availability of an as-applied challenge in like situations of confinement is well understood. Although the Supreme Court held in *Kansas v. Hendricks*, 521 U.S. 346, 371, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997) that Kansas's involuntary commitment statute for sexually violent predators did not violate the due process, ex post facto, and double jeopardy clauses of the United States Constitution, the Court expressly recognized the possibility that a civil commitment statute such as RCW 71.09 could be *applied* in a punitive fashion and thus violate the double jeopardy clause. *See Young*, 176 F.3d at 1199 (citing *Hendricks*, 521 U.S. at 361-63), *amended* (Sept. 16, 1999). In fact the Supreme Court pointedly considered the argument regarding actual conditions of confinement when dismissing Hendricks's double jeopardy challenge:

> And the conditions surrounding that confinement do not suggest a punitive purpose on the State's part. The State has represented that an individual confined under the Act is not subject to the more restrictive conditions placed on state prisoners, but instead experiences essentially the same conditions as any involuntarily committed patient in the state

mental institution. Because none of the parties argues that people institutionalized under the Kansas general commitment statute are subject to punitive conditions, even though they may be involuntarily confined, it is difficult to conclude that persons confined under this Act are being "punished."

*Hendricks*, 521 U.S. at 363 (citation omitted); *see also Allen v. Illinois*, 478 U.S. 364, 373, 106 S. Ct. 2988, 92 L. Ed. 2d 296 (1986) ("Had petitioner shown, for example, that the confinement of such persons imposes on them a regimen which is essentially identical to that imposed upon felons with no need for psychiatric care, this might well be a different case."). If the reciprocal proposition is factually established, i.e., actual confinement under punitive conditions, the statute as applied to that individual imposes double jeopardy because it punishes once again for a crime previously prosecuted and a sentence already served. It is therefore not only appropriate but necessary for the court to examine the actual sanction *as applied* in a particular case to determine if double punishment is imposed contrary to the double jeopardy clause.[42]

## VI
### Equal Protection under State and Federal Constitutions is not Equal

Whether Turay has been deprived equal protection of the laws contrary to either the federal or state constitutions cannot be determined from the majority's conclusory and superficial analysis of the obvious differences between the

---

[42]*In re Personal Restraint of Young*, 122 Wn.2d 1, 23, 857 P.2d 989 (1993) also leaves open the door to an as-applied challenge: "Absent any indication that a criminal purpose was intended, *or actually served by the statute*, the stated civil goals of the Legislature are controlling." (citation omitted) (emphasis added). But because the record there did not contain evidence of the conditions of confinement, the court confined its analysis to the facial validity of the statute.

> There is no evidence in the record addressing either the actual conditions of confinement, or the quality of treatment. *These issues are not currently before the court.* Facially, the Statute and associated regulations suggest that the nature and duration of commitment is compatible with the purposes of the commitment.

*Id.* at 35 (emphasis added).

state and federal constitutional clauses. The majority states, "a long line of Washington cases establishes that the two clauses have the same impact." Majority at 412. I disagree. Although in some situations neither constitution is violated, that is not to say these very different clauses have the same meaning.[43]

"[T]he extent to. which the constitutional guaranties found in article I, section 12, exceed those available under the equal protection clause of the Fourteenth Amendment remains an open question." *Griffin v. Eller*, 130 Wn.2d 58, 65, 922 P.2d 788 (1996) (citing *Sofie v. Fibreboard Corp.*, 112 Wn.2d 636, 642 & n.2, 771 P.2d 711, 780 P.2d 260 (1989); *State v. Smith*, 117 Wn.2d 263, 282-88, 814 P.2d 652 (1991) (Utter, J., concurring)); *see also Darrin v. Gould*, 85 Wn.2d 859, 868, 540 P.2d 882 (1975) ("Const. art. 1, § 12 may be construed to provide greater protection to individual rights than that provided by the equal protection clause.").[44] Justice Utter has eloquently explained the distinction between the federal and state equal protection clauses:

> We cannot ignore the plain difference in the language and history that exists between the federal equal protection clause and the privileges and immunities language of our own constitution. To do so is to rewrite our constitution without benefit

---

[43]The Fourteenth Amendment to the United States Constitution states in pertinent part: "No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws." Article I, section 12 of the Washington State Constitution states: "No law shall be passed granting to any citizen, class of citizens, or corporation other than municipal, privileges or immunities which upon the same terms shall not equally belong to all citizens, or corporations."

[44]Although the majority criticizes these sources as having "little precedential value," Majority at 413 n.25, the majority does not critically examine the difference in the language and the history that clearly separates the federal equal protection clause from the state privileges and immunities language but merely cites a "long line of cases" which uncritically assume the two clauses have the same impact. Moreover, to say the clauses have the "same" impact implies that when and if the Supreme Court changes its view of federal equal protection the state constitution must then assume a new meaning. This logic is specious. *Cf. In re Detention of Petersen*, 138 Wn.2d 70, 95-107, 980 P.2d 1204 (1999) (Sanders, J., dissenting).

of a constitutional convention and to deprive the people of this state of additional rights, which they adopted in our constitutional convention, without their consent.

*Smith*, 117 Wn.2d at 282 (Utter, J., concurring).

As we are not automatically compelled to conclude the two clauses are always identical in effect and because Turay has urged an independent *Gunwall*[45] analysis, I believe a separate analysis under the Washington privileges and immunities clause is necessary to properly address the question and object to the superficial treatment afforded this important state constitutional question by the majority.

## VII
## Conclusion

Mr. Turay is unconstitutionally confined and I would release him. That such a result might not be welcome in all quarters is no reason to abandon the legal rights of this man—and we must be exceptionally firm in this resolve—for it is in just such unpopular circumstances that the courts must act from principle, not expediency, if they are to discharge their duty.

Should however this matter be retried, I would protect Turay's right to appeal and his Sixth Amendment right to represent himself; I would allow the introduction of evidence concerning the conditions of his confinement; and I would protect Turay's right to challenge testimony that he should lose his liberty simply because he has accessed, or attempted to access, the judicial system. I would redraft the jury instructions to make sure the reasonable doubt standard is preserved, not defeated by doubletalk. Finally I would refrain from weakening the state constitutional equal protection guarantees, the heritage of every citizen of

---

[45]*State v. Gunwall*, 106 Wn.2d 54, 720 P.2d 808, 76 A.L.R.4TH 517 (1986).

this state, which are expressed in a unique text very unlike its national counterpart.

After modification, further reconsideration denied December 22, 1999.